[Crim. No. 578. Fourth Dist. Jan. 10, 1947.]

THE PEOPLE, Respondent, v. DELMAR WILLMURTH, Appellant.

Albert G. Bergman for Appellant.

Robert W. Kenny, Attorney General, Alberta Gattone, Deputy Attorney General, Tom Scott, District Attorney, and Vincent P. DiGiorgio, Deputy District Attorney, for Respondent.

GRIFFIN, J.—Defendant was charged with the crime of burglary, occurring on or about March 7, 1946. He was tried by a jury and found guilty of burglary of the second degree. He was also charged with and admitted a prior conviction of a felony, the crime of possessing molds for counterfeiting coins and having served a sentence therefor in a federal prison camp.

Sometime between February 28 and March 7, 1946, the store building of Sasia and Wallace, in Bakersfield, was burglarized. A check protector and leaves of company checks were removed from the premises. The check protector was later returned. Several of these checks were made out for the amount of $78.19 and were negotiated.

On March 9, 1946, one of the checks, payable to Jesse Davenport, signed "Lem D. Wallace" was brought to the attention of Mr. Wallace, one of the members of the firm of Sasia and Wallace. He recognized that the signature was not his. A call came from the Circle Bar to the effect that a man was trying to pass his company's check there. Officer Jones drove to the Circle Bar where one Fred Johnson was standing around waiting to receive money from the check he had just cashed. Defendant Willmurth was present in the bar at the time. In his attempt to put Johnson under arrest, after he showed considerable resistance and endeavored to escape, the officer shot him. He later died.

A bartender at Gene's Bar, who had cashed the first check for $78.19, about 2 p. m. on March 9, 1946, testified that he knew the deceased, Johnson, by reason of his coming into the bar; that he "knew him as Jesse Davenport"; that defendant Delmar Willmurth was with him at that time and was wearing dark glasses.

Johnson also cashed a similar check at Beebe's Bar between 12 noon and 2 p. m. and bought a pint bottle of Southern Comfort liquor. About 2:30 p. m. Johnson called at the home of one Dorothy Deaton, in a blue Mercury coupe which was owned by defendant Willmurth. Some man wearing dark glasses waited for Johnson outside of the house in the coupe. According to her testimony, Johnson came to pay Dorothy Deaton's husband some money he owed him. At 3 p. m. Johnson, defendant Willmurth and the accomplice Arthur J. Stewart who testified against Willmurth, were seen together at the River Cafe, a short distance from the Circle Bar. Defendant Willmurth testified at the preliminary examination

that he had not seen Johnson that day but that he just happened to be at the Circle Bar at the time of the shooting. He did not take the stand at the trial.

The evidence indicates that defendant Willmurth was driving Johnson around from bar to bar in his blue Mercury coupe. A small bottle of Southern Comfort liquor was later found in Willmurth's car at the time of his arrest. These facts were proved independently of the testimony of any accomplice.

Arthur J. Stewart, after pleading guilty to the identical charge, testified that he had known Johnson for about five years; that he lived with him on occasions; that they had been roaming around together for the last twelve days; that he had known Willmurth since March 7th; that he met him with Johnson at Pete's Cafe; that they talked a while and then the three of them went in Willmurth's car to Willmurth's house and had a few drinks; that about 7:30 p. m. the three of them went to Sasia and Wallace's store building; that on the way Willmurth told Johnson something about some checks at that store; that they parked the car; that Willmurth had a little pencil flashlight and a large screwdriver with a yellow handle with him; that they tried to open one of the windows in the store and finally Willmurth opened one of them from the top; that Johnson and Willmurth went inside and told him to keep watch outside; that they were in there about 10 minutes and came out with the check protector and numbered leaves of checks with the name of Sasia and Wallace, Inc. printed on them; that they all got in the car and went to Willmurth's house and that was the place where the checks were made out and Willmurth ran them through the check protector; that Johnson started to fill out a couple of them but that they didn't "look so good," so they disposed of those two; that Willmurth then said he would have someone else make them out the next day; that the three went back to the store building and that he and Johnson replaced the check protector; that they met the next day and the day following; that Johnson and Stewart met at the River Cafe and Willmurth came in later; that Johnson walked off down the highway and Willmurth picked him up; that the next day he heard that Johnson was hurt; that Willmurth left word for Stewart to meet him; that they met and Willmurth told him to keep still about what happened. A flashlight, identified by the witness as being the

same size and color as that used by defendant, was found in defendant's car and was received in evidence.

Mr. Wallace testified that he discovered screwdriver marks or indentations on the window sill; that screws were pulled up out of the window latch, but that he was unable to determine whether anybody made entry or whether they were frightened off at that time. He fixed the date of this discovery as of February 28, 1946. At that time he did not look to see if any blank checks were missing from the back of the check book.

In addition, the evidence shows that Stewart, soon after the shooting, left town and later returned and confessed. He was arrested and taken to the hospital for identification by Johnson. Johnson was quite ill and in bed. He had a tube of some description in his nostrils.

It was brought out by counsel for defendant that the deputy sheriff "asked Johnson if he recognized Stewart and he said 'yes' "; that he asked him "what the cut was to be, if there was to be a cut, and Johnson said '50-50'." In rebuttal, the deputy testified that "Johnson and Stewart were talking. Johnson told Stewart, he says: 'I think that this is it.' He says: 'When I go I want to go with a clear record.' He says: 'I have told my whole story.' At that time I asked Johnson in regard to how they were going to split the proceeds from their check cashing or forgery. He says: 'It was sixty-five—thirty-five.' Willmurth would get sixty-five per cent and he and Stewart would split their portion, thirty-five per cent,—fifty-fifty."

Defendant Willmurth was thereafter placed under arrest and taken to the hospital for identification by Johnson. The officer testified, over objection, that he "asked Johnson if this man here, indicating Willmurth, was the man that went with he and a party by the name of Stewart to the firm of Sasia and Wallace, 230 South Union Avenue, for the purpose of burglarizing the checks and steal a check protector and some blank checks. He answered 'Yes.' I stood there for just a few seconds and walked out in the hall with Willmurth. Q. At that time, while you were in the room, did Mr. Willmurth make any reply whatsoever? A. No, he kind of shook his head, then out in the hall he says to me . . . A. Willmurth said he didn't know what it was all about." He was then returned to the identification bureau where Stewart had given a detailed statement of the burglary. Willmurth was brought

into the room where Stewart was seated and according to the officer's testimony, Stewart spoke to Willmurth and called him by name. Stewart said to him: "Willmurth, you might as well come clean, Johnson has told the story and so have I." Nothing else was said at that time but "The defendant kind of grinned and shrugged his shoulders." And they took the defendant back to the jail. A shorthand reporter was present and took down the conversation. It was in part as follows:

Q. (By Mr. Fisher, deputy sheriff): "Mr. Stewart, you have just given us a statement in regards to the office burglary of Sasia and Wallace, 240 South Union Avenue. Mr. Stewart: Yes, Sir. Mr. Fisher: In regards to the blank payroll checks being stolen and the check protector, and being taken to a man's house, and you have named a party by the name of Fred Johnson. Mr. Stewart: Yes. Q. And who was the other party? A. Delmar. (Indicating) This man here. Q. This man here. Delmar Willmurth? A. Yes, sir. Q. That was the man that was with you? A. Yes, sir. Mr. Stewart: I was just up and talked to Fred, and he told these boys about the deal. A. (No answer from Mr. Willmurth.)"

An examiner of questioned documents, Mr. Clark Sellers, testified that the Company's "check protectorgraph," admitted in evidence, was the machine used in "check protectorgraphing" each of the eight checks in evidence; that the handwriting on the checks was not the handwriting of any of the three mentioned persons, except the endorsement of "Jesse Davenport" was in the handwriting of Fred Johnson.

The first contention made on this appeal is that the evidence is insufficient to support the verdict or judgment of conviction for the reason that the evidence offered to corroborate the testimony of Arthur J. Stewart, an accomplice, falls short of the requirements of section 1111 of the Penal Code, citing such cases as People v. Sawaya, 46 Cal.App.2d 466 [115 P.2d 1001]; People v. Ciani, 104 Cal.App. 596 [286 P. 459]; People v. Gilbert, 30 Cal.App.2d 321 [86 P.2d 135]; People v. Kempley, 205 Cal. 441 [271 P. 478]; People v. Bacos, 14 Cal.App.2d 338 [58 P.2d 221]; and the general rule laid down in 4 Cal.Jur. 10-Yr. Supp. (1943 Rev.), page 705 et seq., §§ 255, 256, and 257.

In considering the question of corroboration, the relationship of the parties and their acts and conduct are competent evidence to be considered, and since corroboration need

not be by direct evidence, the entire conduct of defendant may be looked to for corroborating circumstances and if, from those circumstances, his connection with the crime may be fairly inferred, the corroboration is sufficient, and such independent corroborative evidence may consist of contradictory statements made by the accused or his silence in the face of accusatory statements, or false statements made in connection with the matters connected with the commission of the crime. (*People* v. *King*, 40 Cal.App.2d 137 [104 P.2d 521]; *People* v. *Rice*, 29 Cal.App.2d 614 [85 P.2d 215]; *People* v. *Ross*, 46 Cal.App.2d 385 [116 P.2d 81].)

In the light of these general rules let us examine the evidence. It has been conclusively shown that some time between February 28th, 1946, and March 9th, 1946, a burglary was committed and blank checks were taken from the store building of Sasia and Wallace. The evidence is also conclusive that some of these checks, which were stolen from Sasia and Wallace, were seen in the possession of and cashed by Johnson. Apparently, Johnson admitted his part in the burglary, and on his deathbed, he involved both Stewart and defendant Willmurth. Stewart had pleaded guilty to the charge and had been sentenced to serve a term in the county road camp at the time of the giving of his testimony. From a reading of the entire transcript, we have not found that his testimony has been otherwise materially impeached. The evidence is also well established that Willmurth was with both of the other men on the day of the burglary and was suspiciously seen, with dark glasses on, in several of the bars, with Johnson, and was seated beside him in conversation when he was cashing some of the checks obtained in the burglary. He was also seen driving his blue Mercury coupe with Johnson in it. It was positively identified by other witnesses. Stewart testified that a pencil flashlight was used by Willmurth in entering the store building. An identical pencil flashlight was found in the Willmurth car at the time of his arrest. This is one outstanding circumstance that the jury had the right to consider. Also, the window sills had impressions made by a screwdriver, even though there is some irregularity regarding the date they were made.

Stewart testified that entrance was gained through the upper half of the window and that the check protector was returned to the office. These facts stand corroborated by other witnesses. Defendant was identified by Johnson, in the

hospital, and by his answer to the officer's question, Willmurth was directly accused of having a part in the burglary. It is not clear whether defendant, in the *presence of the accuser*, admitted, denied, or evaded the accusation. He was later confronted with the accusation of the coconspirator, Stewart, who directly accused him of being a participant in the burglary, to which accusation defendant failed to respond.

By way of further corroboration of the testimony of the accomplice defendant, at the coroner's inquest, testified that he had not seen Johnson on March 7th, at any place except the Circle Bar; that he knew Johnson only "slightly" and that he did not know it was Johnson who had been shot until he read about it in the paper the next day. These statements were clearly established to be false and untrue. Further, the Southern Comfort liquor, purchased by Johnson, was found in Willmurth's car.

Stewart testified that the checks were written by Willmurth on the check protector which belonged to Sasia and Wallace. The examiner of questioned documents corroborated the fact that they were written by this particular machine. All of this evidence was unexplained by the defendant.

In *People* v. *King,* 40 Cal.App.2d 137 [104 P.2d 521], this court said, at page 141:

"The entire conduct of the accused may be looked to for corroborative circumstances and if therefrom his connection with the commission of the crime may be fairly inferred the corroboration is legally sufficient. . . . Where the defendant makes no attempt, by his own testimony or otherwise, to contradict, explain or deny any of the circumstances established against him, the jury is entitled to consider those circumstances in determining his guilt. (Citing cases.)"

We are convinced that the independent evidence sufficiently corroborates the testimony of the accomplice Stewart. (*People* v. *Payton,* 36 Cal.App.2d 41 [96 P.2d 991]; *People* v. *Malone,* 25 Cal.App. 764 [145 P. 550]; *People* v. *Ross, supra; People* v. *Rice, supra; People* v. *Wiley,* 33 Cal.App.2d 424 [91 P.2d 907]; *People* v. *Ward,* 40 Cal.App.2d 143 [104 P.2d 537].) The question of the weight and sufficiency of the evidence was rightfully left to the jury. (*People* v. *Yeager,* 194 Cal. 452, 486 [229 P. 40].)

■ The second point raised involves the question of the admissibility, over objections, of the accusatory statement made at the hospital in the presence of Johnson and defen-

dant Willmurth, and of his reply thereto. It is argued that there was .no accusatory statement, as such, made in defendant's presence, which called for a reply from him; that if it was such, that he denied it and therefore the prosecution was precluded from placing such evidence before the jury. It will be remembered that defendant was taken to Johnson's room for the purpose of identification. There the officer, in Willmurth's presence, asked Johnson if he was the man who went with him—for the purpose of burglarizing the described store and that Johnson answered "yes." The officer testified that Willmurth made no reply whatsoever. "He kind of shook his head." The record does not indicate in what manner he shook his head and what he intended to indicate by his actions. It cannot be said that defendant, in the presence of the accuser, intended to and did flatly deny such accusations in such a manner as would be expected from an innocent man accused of such participation. The least that can be said is that he waited until he was outside in the hall, out of the presence of the accuser, before he remarked that "he didn't know what it was all about."

Defendant cites some of the latest expressions of the Supreme Court on the subject and relies principally upon *People* v. *Simmons*, 28 Cal.2d 699 [172 P.2d 18]. There it was held, by the majority decision, that such statements are hearsay unless they come within the exceptions to the rule: (1) That if a defendant responds to an accusatory statement, made in his presence, with a flat denial, there is no admission and the statement may not be received in evidence; (2) that if, on the contrary, the truth of the statement is admitted, the admission may properly be introduced; and (3) when the accused stands mute in the face of the accusation or responds with an evasive or equivocal reply, in that situation it has been held that under certain circumstances both the statement and the fact of the accused's failure to deny are admissible on a criminal trial as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt, and that the theory underlying this rule is that the natural reaction of an innocent man to an untrue accusation is to enter a prompt denial; that where his response is silence, evasion or equivocation, it is for the trial court to determine in the first instance whether the accusation has been made under circumstances calling for a reply, whether the accused understood the statements, and

whether his conduct or response was such as to give rise to an inference of acquiescence or guilty conscience; that where the trial judge determines that such an inference may be drawn, the statement is then admitted, not as substantive evidence in proof of the fact asserted, but merely as a basis for showing the reaction of the accused to it. (Citing cases.)

The trial court, in the instant case, determined, by its ruling, that the import of the accusation and the defendant's reply thereto, might furnish a foundation for proof of conduct. It was then for the jury to decide whether the accused was aware the statements or accusations were made, whether, under all of the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether, if he did not do so, such failure showed criminal intent or a consciousness of guilt.

█ The trial court instructed the jury "that when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt. The only purpose for which an accusatory statement is received in evidence is to show acquiescence or admission on the part of a defendant in the face of an accusatory charge,—and unless you are convinced beyond a reasonable doubt that the defendant did stand mute when the accusatory statements were made, such statements should be entirely disregarded by you . . . that if you believe beyond a reasonable doubt that the defendant was afforded a fair opportunity to deny accusations by accomplices and that he failed and refused to so deny but remained silent then 'his conduct and his silence in the face of accusatory statements sufficiently corroborates the charge of the accomplices.' '' (*People* v. *Collins,* 4 Cal. App.2d 86, 87 [40 P.2d 542].)

In an instruction requested by defendant, the trial court instructed the jury "that in considering the evidence in this case in connection with any instructions I have given you on the subject of accusatory statements, the entire conduct of a person, allegedly accused should be taken into consideration by you. In this respect you may judge for yourself whether a question asked of a person by a police officer in the presence of a defendant calls for an answer or reply by the defendant . . ."

The defendant claims the prosecution's instructions were erroneous. We perceive no prejudicial error in the instructions as given, and there was no abuse of discretion on the part of the trial court in allowing this evidence to go to the jury under those instructions. (Code Civ. Proc., § 1870, subd. 3; *People* v. *Yeager, supra; People* v. *Orloff*, 65 Cal.App.2d 614 [151 P.2d 288].)

This same conclusion must be reached as to the claimed accusation made by the accomplice Stewart in the presence of the defendant, at which time no denial was made by him.

█  The next complaint is directed to the failure of the trial court to grant defendant's motion for a mistrial, predicated on the following questions and answers.

On arraignment defendant admitted a prior conviction of a felony in the Southern District of California, Northern Division, on April 3, 1939, and that he served a term of imprisonment in the Federal Prison Camp at Tucson, Arizona. Clark Sellers, who testified as to the handwriting of the three persons involved in the claimed burglary, after being recalled by the People for further examination, testified as follows:

"Q. (By Mr. DiGiorgio) In examining the documents, did you examine them for any other purpose than the protertorgraph writing? A. Yes. Q. What was that? A. I examined the typewriting to determine if I could what typewriter was used, the typewriting on the face of them. I examined the signature Glen D. Wallace, which is seen in evidence in Exhibit No. 1, and I examined the endorsement on the back where the same reads Jesse Davenport. I made those examinations in addition to examining the check protectorgraph. Q. Were you furnished with exemplars in connection with those checks? A. Yes, of the handwriting, not of the typewriting. I notified the District Attorney's office that the typewriting, I think I notified them that each check was written on a Corona typewriter, but no specimens of a Corona typewriter were furnished to me to compare with the typewriting on the face of the checks. Some specimens of handwriting were furnished to me and I also went to the United States probation Office in Los Angeles and examined some specimens there of handwriting. Q. Of what individuals, who were the individuals? A. I examined in my office and at the United States Probation Department Office specimens of the handwriting of the defendant, Mr. Willmurth. I examined in my office specimens of the handwriting of Fred John-

son and I examined in my office the handwriting of Arthur J. Stewart . . . A. I could not identify the defendant Mr. Willmurth as having written the name of Glen D. Wallace on the face of these checks. I could not identify Arthur J. Stewart as having written the name Glen D. Wallace on the face of these checks. . . .''

No objection was made to the questions propounded and no motions to strike any of the above-mentioned testimony were made by counsel for the defendant.

After considerable evidence had been taken and at the close of the day's session, counsel for defendant moved the court for a mistrial. This motion was presented at that time, apparently through some understanding with the court that such right had been reserved. The motion recited that *Mr. DiGiorgio* was guilty of *prejudicial misconduct* in asking of Mr. Sellers a question which he knew would call for an answer indicating that the defendant had previously been convicted of a felony and later placed on probation, in violation of section 1025 of the Penal Code.

There is nothing in the question as propounded, that would indicate to us that Mr. DiGiorgio sought by the question asked any reference to the fact that the defendant had been previously convicted of a felony. The answer, so far as the record is concerned, was a voluntary and unsolicited remark of the witness in response to a legitimate and fair question. In and of itself, it may have indicated by inference, that the defendant might have had some reason to have an exemplar of his handwriting in the United States Probation Office in Los Angeles. This fact, standing alone, would not be proof that defendant had been convicted of a felony and had served time in a federal prison or camp. No motion to strike the voluntary answer was made and no opportunity was given the trial judge to strike the portion referred to nor to admonish the jury in respect to it. Standing alone, the statement made by the witness would not necessarily have been considered prejudicial misconduct on the part of the deputy district attorney. The ruling of the court on the motion for a mistrial on that ground was proper.

The contention that that evidence did have some impression on the jury receives some support from the question later propounded by the jury foreman. After the jury had retired and after several hours of deliberation, it returned into court and the foreman asked to have that portion of the

testimony re-read. The trial court ordered all of the testimony of Mr. Sellers re-read. Counsel for defendant again moved for a mistrial on the same ground previously urged. This motion was denied. Later, the jury returned a verdict of guilty of burglary of the second degree. A motion was later made to set aside the verdict on that ground. The motion was argued and denied. On a motion for new trial the same prejudicial misconduct of the district attorney was claimed. Some of the other questions here presented on appeal were set forth in the motion for new trial and after due deliberation, the trial court denied the motion.

Section 1025 of the Penal Code provides that "the charge of the previous conviction (set forth in the information) must not be read to the jury, nor alluded to on the trial." From the record, it can hardly be said that the particular *felony described in the information* was alluded to on the trial. The fact that defendant may have had an exemplar of his handwriting in the office of the United States Probation Office could not establish that fact. There are many reasons why it may have been there. It was only by inference that counsel for defendant could draw his conclusion that the allusion to the handwriting in the United States Probation Office established the fact that the defendant had been previously convicted of a felony. It is unfortunate that this testimony crept into the record. If the trial court believed it influenced the jury in its deliberations it was at liberty to grant a new trial. Apparently, it believed otherwise, and we are not prepared to say, as a matter of law, that the trial court should have granted defendant's motion for a mistrial, or the motion for a new trial based on the ground of *prejudicial misconduct of the deputy district attorney.* This was a matter of sound judgment and discretion for the trial court to exercise. He was familiar with all of the facts of the case. This is not a case where the prosecuting attorney asked a defendant questions which he knew were inadmissible and wrong, or where the question asked of the witness was asked with the clear purpose of prejudicing the jury against the defendant, as was done in *People* v. *Wells,* 100 Cal. 459 [34 P. 1078]. At no time during the trial did defense counsel object to this testimony or move that it be stricken, or ask that the jury be instructed to disregard it. When the jury returned and asked to have that portion of the testimony read to them, counsel for the defense did not raise his voice to object, but sat quietly by and permitted the court

to have the objectionable portion read. If counsel had made a timely motion to strike, at the time the evidence was offered, the testimony could have been stricken from the record and then it would not have been read back to the jury. It would have had instructions to disregard the testimony and it would, no doubt, have done so. In the absence of an objection or motion to strike the answer as given, we are not prepared to hold that the ruling on the second motion for mistrial was prejudicially erroneous. (*People* v. *King,* 13 Cal.2d 521, 526 [90 P.2d 291]; *People* v. *Stone,* 199 Cal. 610 [250 P. 659]; *People* v. *West,* 215 Cal. 87, 96 [8 P.2d 463]; *People* v. *Mancuso,* 23 Cal.App. 146, 147 [137 P. 278]; *People* v. *Krug,* 10 Cal.App.2d 172, 174 [51 P.2d 445].)

■ Defendant claims, as reversible error, the conduct of the deputy district attorney in calling Mrs. Willmurth to the witness stand and asking the following questions:

"Q. What is your full name, please? A. Dorothy Willmurth. Q. Are you actually related to this defendant in any way? A. Yes, sir. Q. How? A. I am his wife. Q. Where were you married? A. Shafter, California. Q. When was that? A. All right, sir, we are not married. Q. Are you acquainted with Mr. Willmurth? A. Yes, sir. Q. How long have you known him? A. Three and a half years approximately . . . Q. Were you present at the time Mr. Willmurth was arrested? A. Yes, sir. . . . Q. Will you tell us what occurred that day? A. Yes, sir. . . . Q. Do you know where Mr. Willmurth was that afternoon of Saturday, March 9th? A. Yes, he was home. . . . Q. Was he home all afternoon? A. That is right. Q. What kind of a car did Mr. Willmurth have? A. It was a 1941 Mercury. Q. What color is that car, if you know? A. Blue. Q. How long have you been staying there with Mr. Willmurth? (Objection by Mr. Bergman). Mr. DiGiorgio: Withdraw the question. . . . CROSS-EXAMINATION. By Mr. Bergman: Q. Mrs. Henry, I don't like to pry into your private life, but these questions have been asked, I don't intend to embarrass you. You have been living with Mr. Willmurth as husband and wife for how long? A. Three years. Q. When you first met Mr. Willmurth did he at any time immediately after you began living with him as his wife or before, ask you to marry him? A. What? Q. Mr. Willmurth asked you to marry him when you first met him? A. Yes. Q. Was there any reason, if you know, why you

didn't marry him? A. Yes, sir . . . Because I married a man and after I married him I found out he was already married, so I left him. There was nothing done about it, I didn't know what to do so I didn't know whether I was married or whether I wasn't.''

The evidence of the witness was not very beneficial to the People. It related to the ownership and description of defendant's car, the time when he quit working, and her endeavor to establish an alibi for the defendant. It did incidentally show the conditions under which the defendant and the witness were living. This was not particularly material to the issue. No objection was made to the questions propounded, nor was any motion made to strike the answers given. In fact, on cross-examination, counsel for defendant himself accentuated the fact of the illicit relationship. If defendant had established that this evidence had been offered for the direct purpose of prejudicing the jury in this respect, and proper objection been made thereto, or a timely motion to strike the objectionable answer had been made, and the trial court had been afforded an opportunity to rule upon them and admonish the jury in respect thereto, we would be more impressed by defendant's argument. (*People* v. *Dollor,* 89 Cal. 513 [26 P. 1086]; *People* v. *McAlpine,* 25 Cal.App. 727, 728 [145 P. 152]; *People* v. *Braun,* 14 Cal.2d 1 [92 P.2d 402]; *People* v. *Gonzales,* 69 Cal.App. 609 [231 P. 1014]; *People* v. *Morrell,* 28 Cal.App. 729 [153 P. 977]; 8 Cal.Jur. 500, § 516.) This claim of error should not be raised for the first time on appeal. (*Story* v. *Nidiffer,* 146 Cal. 549 [80 P. 692]; *People* v. *Owens,* 123 Cal. 482 [56 P. 251]; *People* v. *Schafer,* 161 Cal. 573 [119 P. 920]; 8 Cal.Jur. p. 503, § 517.)

We have made a complete study of the entire record, including the transcribed copy of counsels' arguments in this court. There was certain evidence received that should have been, upon proper motion, stricken from the record. It was not the duty of the trial court to cause such evidence to be stricken unless its attention was called to that evidence by a proper motion. We therefore must conclude that there was competent evidence supporting the judgment of conviction, and we are not prepared to hold that defendant did not have a fair and impartial trial. The evidence of defendant's guilt was sufficient to uphold the judgment under section 4½ of article VI of the Constitution, of California, and it does not

affirmatively appear that there has been a miscarriage of justice.

Judgment and order affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied January 24, 1947, and appellant's petition for a hearing by the Supreme Court was denied February 6, 1947.