[Crim. No. 4106.   Second Dist., Div. One.   Dec. 19, 1947.]

THE PEOPLE, Respondent, v. GLEN O. ARBAUGH, Appellant.

William C. Ring for Appellant.

Fred N. Howser, Attorney General, and Ward Sullivan, Deputy Attorney General, for Respondent.

WHITE, J.—In five counts of an amended information filed by the District Attorney of Los Angeles County, defendant was accused of the crime of burglary, while a sixth count charged him with the commission of the offense of grand theft.

In each count it was also charged that at the time of the commission of the offense therein stated the defendant was armed with a deadly weapon, to wit, a revolver.

Following pleas of not guilty to each count, the cause proceeded to trial before a jury which returned verdicts finding the defendant guilty of burglary as charged in counts II, III, IV and V, and not guilty as to counts I and VI. The jury also found that at the time of the commission of the burglaries of which he was found guilty, defendant was armed with a deadly weapon, to wit, a revolver. A motion for a new trial was denied.

From the foregoing judgments of conviction, defendant prosecutes this appeal.

Upon the dates named in the amended information and at the time of his arrest, appellant was a police officer of the city of Long Beach, assigned to duty as a radio car officer.

Because appellant challenges the sufficiency of the evidence to support the verdicts on all counts, it becomes necessary to set forth an epitome of the evidence relied upon to sustain said convictions. Viewing the evidence in the light most favorable to the prosecution, as we are required to do following guilty verdicts, we find in the record with reference to count II, testimony that some time during the night of January 6, 1946, the California Laundry, located at 1203 West Ocean Avenue in the city of Long Beach, was burglarized, and a considerable amount of wearing apparel and flat work, sheets, pillowcases, shirts and towels, were taken. It was some 10 days before the proprietor of the laundry was able to determine what property was taken because he had to wait until the customers of the laundry who owned the

property in question notified him of shortage. All laundry that was brought in had individual markings. Charles C. Harris, a customer of the laundry, claimed the loss of some shirts shortly after January 7. His laundry mark was 312-K. Defendant had never been a customer of the laundry in question. The attention of the witness Moody, owner of the laundry, was directed to an Arrow brand shirt with three markings on it, 312-K and 91-6, and a Flosheen brand shirt bearing the same numbers, and he testified that the owner of these two shirts, as indicated by the laundry mark, was the aforesaid Charles C. Harris. A Mrs. Hasha of Long Beach, whose laundry mark was H-164, also made a claim shortly after January 7, 1946, for the loss of some sheets or flat work. The witness Moody was shown a sheet which he identified as the property of Mrs. Hasha because it bore her laundry mark.

Charles C. Harris testified that during the early part of January, 1946, he took to the California Laundry six white shirts bearing his laundry mark 312-K, that when he returned for the shirts on January 11, they were missing. He identified two shirts bearing his laundry mark as the shirts he had left at the laundry and stated that it was his best judgment that the shirts belonged to him.

The following evidence was addressed to count III: Walter B. Jessing owned a dry-cleaning establishment at 1344 West Willow Street, Long Beach, which he operated under the name of Bee-Jack Cleaners. On the evening of February 8, 1946, he closed and locked his place of business and was the last one to leave. He returned to the store the following day at 3:20 a.m. because defendant called at his home, told him that his place of business had been burglarized, and he accompanied the defendant to his establishment. Upon his arrival the witness noticed his place of business was open and the back window had been broken. Officer Golson, defendant's working partner, was waiting at the store when the witness and defendant arrived. A preliminary check showed that some articles were missing, and the next morning when the witness completed his inventory he found missing a number of suits of clothes, sport shirts and jackets. When at the trial this witness was shown a jacket, he testified that it had been left with him for cleaning by Mr. Nixon, that the jacket was in the store on February 8, but was missing when the inventory was taken the next day.

This witness also identified a three-piece suit of clothes as belonging to a Gil Binger. This suit had been cleaned and pressed and was in the store February 8, but found missing on the morning of the 9th.

A shirt was identified by the witness as belonging to Al Miller and as having been left for alterations on February 8, but was also missing on the morning of the 9th.

The witness testified that the next time he saw any of these garments was when he was taken to defendant's apartment by police officers, at which time he discovered and identified the garments and the police took them into their possession.

The witness also identified a suit of clothes as belonging to a Mr. Grenstad, which garment had been left for cleaning and was in his establishment February 8, but missing on the morning of the next day. The next time the witness saw this suit of clothes was on September 27, 1946, at the police department.

On cross-examination, this witness testified that when he and defendant went to the dry-cleaning establishment early on the morning of February 9, Officer Golson was inside the place. That when the witness next saw the foregoing garments they were hanging in the closet at the residence of defendant.

Mrs. Edna B. Grenstad, Harold G. Nixon, and Gilbert Binger identified some of the foregoing articles as belonging to them and as having been left by them at the dry-cleaning establishment.

Police Officer A. J. Anderson of Long Beach testified that he was acquainted with defendant; that on or about September 7, 1946, he went to the latter's residence in Long Beach in company with Mr. Jessing of the Bee-Jack Cleaners. This witness identified the foregoing articles of clothing as having been found by him and Mr. Jessing in a closet of the apartment occupied by defendant on September 7, 1946, and that he removed the property to the detective bureau at the police station.

Concerning count IV, there was testimony by Harold Nixon that he and his partner, Douglas G. Wallace, owned a radio store at 1521 West Willow Street, Long Beach. That on Sunday afternoon, February 17, 1946, after cleaning his place of business, he locked the place up and departed. The following morning when he returned he found one of the

"job tickets" lying out in front of the store and when he entered discovered that a window had been broken and the bars thereon knocked off. That when he left on the preceding evening that window was closed and barred. He found that three radios, some cash, and tools were missing from the store. One radio was a camera-type portable; one was a Majestic, single-record player; and a Truetone automatic combination. These latter sets were table models. At the trial the witness identified two radios which he stated were in his store on February 17, 1946, one a Truetone and the other a Majestic radio. Concerning the Majestic radio, the witness testified that the job ticket he found in front of the store had been attached to that radio and that the owner thereof was a man named Hank. That the Truetone radio was owned by a chief petty officer in the Navy named Herring. The next time the witness saw these two radios was some five months later at the Long Beach police station.

George S. Fatino testified that he knew defendant and had a business transaction with him concerning the purchase of a radio. This witness identified a check in the sum of $55 as having been issued by him. He stated that at the time he issued the check there was no writing, figures or printed matter upon the check, which he delivered to his brother-in-law, Levi Ballard, and at the same time received from Ballard and the brother of the witness the Truetone radio above referred to. The radio was received by him on the date the check was issued, namely, February 23, 1946. That he kept the radio in his home until Long Beach police officers took it therefrom.

It was stipulated that the defendant received and endorsed the check in question and that the check was paid by the bank.

It was stipulated that if Homer E. Herring were called as a witness and sworn he would testify that the foregoing Truetone radio belonged to him; that he would identify it because the nut on the center of the turntable was missing and a felt washer under the extreme end knob on the front of the radio was also missing.

Harry E. Brady testified that he is employed at the United States Naval Drydock; that he was acquainted with and related by marriage to George S. Fatino; that he had known defendant for approximately 14 years. That during the month of February, 1946, he and his brother-in-law Ballard

met defendant on the street, following which he and Ballard accompanied defendant to the latter's apartment, where they looked at a radio which to the witness appeared to be the same as one of those introduced in evidence at the trial. That at the time, the witness told defendant he would advise George Fatino about it. This witness identified a check as having been issued by him in favor of defendant for the sum of $55. Subsequently, the witness saw the radio in question at Mr. Fatino's home.

This witness was also shown a check for $21 dated January 9, 1946, payable to the order of defendant, signed by the witness, and which he stated he delivered to defendant in payment for some linens. That defendant asked the witness if he wanted to buy some linen, which was very hard to get at that time, and the witness stated that he would. That defendant then showed him some sheets and towels, approximately twelve sheets and a dozen or a dozen and a half towels. That defendant first told the witness he would sell them for $25, but later agreed to take the sum of $21, at which time the witness wrote and delivered the foregoing check and took the linens home. When shown certain linens at the trial, the witness stated that they appeared similar to some of those he had purchased from appellant. Subsequently, this witness delivered to a Long Beach officer two sheets and one or two small towels which he stated were part of the articles which were purchased by him from defendant. He testified that these articles which he purchased from defendant were the only ones in his home upon which there were laundry marks because his wife did her own laundry and all the other linens belonging to him had no laundry marks on them.

As to count V, the record reflects that J. L. Wood testified that in January, 1946, he was manager of a retail food market called Ben's Market, located at 1370 West Willow Street in Long Beach. That on Sunday, April 27, 1946, he was taking inventory at the market and left there about 4 o'clock in the afternoon, after locking up. That about 6 o'clock that same evening he returned to the market to obtain some provisions for home consumption. At that time he noticed that there were less than 30 pounds of butter in the icebox, but everything appeared to be in order about the store. On the following morning about 9 o'clock, he returned to his place of business and noticed that the office door was open, whereas it

was closed the evening before. In the store he found 10 pounds of butter stacked up on some merchandise directly in front of the door to the icebox. He then looked for some "rolled money" which he kept in a built-in desk and found approximately $429 missing. The window on the west side of the store had been opened and the chains on it were broken. Some of the cans were knocked off the shelf and a sign or marker, indicating the fruit section, directly under the window, was bent where the window had fallen down. Under the front door of the store there was a note written on a card, which note, except for the printed matter thereon, it was stipulated was in the handwriting of the defendant. The card bore printed matter reading: "Long Beach Police Department, Crime Prevention Bureau. To the Management of." Then follows, in pencil, "Ben's Mkt." The printed words, "Your door," are scratched out and then follow the printed words "window (underlined) was found unlocked at _____ M., _____, 1946. Property left out _____ and is now at our Property Clerk's office. Alvin F. Slaight, Chief of Police By." Then appears in defendant's handwriting the names "Golson & Arbaugh." On the other side of the aforesaid card, in the handwriting of the defendant, appears the following: "Please leave the back shade up so we can see the safe everything looks ok at 12.30 but could not see in back window. Golson & Arbaugh Long Beach P.D."

The following additional evidence was addressed generally to counts II, III, IV and V: Gran Golson, admittedly an accomplice of defendant, testified that he was a provisional police officer of the city of Long Beach; that he first met defendant when he was assigned to duty on the police force in July, 1945. Shortly before Christmas of that year he was assigned to work on a police radio car with defendant and continued to work with him most of the time thereafter up to and including the month of April, 1946. He testified that they were on what is called the "graveyard shift," that is from about 11:30 p. m. to 7:30 a. m. This witness testified that he was familiar with the premises known as the Bee-Jack Cleaners; that in the early morning hours of February 9, 1946, he and the defendant drove in their radio car to the vicinity of the establishment. After stopping the car they "snooped" around the building, arrived at a side gate, went behind the building and several other establishments.

That defendant said, "Let's go in here and look around inside here." That shortly thereafter defendant mentioned the fact that he liked clothes and they opened the gate and went into the back of the cleaning establishment. They then approached a small window in the lavatory in the rear of the building, whereupon defendant said, "I believe this is the window into the lavatory in this cleaners," and thereupon proceeded to break the window glass, reached through, opened the window and crawled through. The witness testified he followed defendant into the lavatory through the same window; that defendant had a flashlight and was wearing a pair of gloves. The witness testified that both he and defendant at that time were armed, each with a revolver. After effecting entrance they proceeded into the shop and examined various clothes in the place. That defendant selected a couple of suits, two or three shirts, and then the two of them went out through the front door to the police car where defendant placed the garments in the turtleback of the vehicle, saying, "I think we ought to get in touch with the owner and notify him." That defendant then obtained the address of Mr. Jessing, the owner of the establishment, and while the witness remained at the building defendant went to Mr. Jessing's residence and shortly thereafter returned with Mr. Jessing. That Mr. Jessing thereupon looked the place over, stating that he was unable to then determine that anything had been taken. He then locked up the premises and, after drinking some coffee with this witness and defendant, the latter two drove Mr. Jessing home. That the witness and defendant then drove to the latter's residence where they parked in the alleyway; defendant took the foregoing wearing apparel out of the turtleback into his residence.

The witness further testified that on the night of February 17, he was working with defendant when the Nixon Radio Store was burglarized. The witness testified that he suffers from a disability for which he draws compensation from the government, that as a result of this affliction, he is subject to very violent headaches resulting from a painful concussion which from time to time causes him to "pass out" for periods of time varying from 15 minutes to an hour. That during the time he was employed in the police department he had these "black outs" intermittently. That he had no recollection of going into the Nixon-Wallace Store or of defendant enter-

ing the same. That he did have a recollection that on that particular night he had a "blackout" or a period of total unconsciousness, and did not see any radios in or about the police car. That three or four days thereafter he had a conversation with defendant at police headquarters wherein he mentioned to defendant that he would like to have a radio-phonograph, to which defendant responded that perhaps he could "fix him up," that he had one over at his house. That a day or two later, the witness went to defendant's apartment and purchased a Majestic radio from him for $25 in cash. At the trial, the foregoing Majestic radio which was taken in the radio shop burglary was identified by the witness as being the one he purchased from defendant. Subsequently, this radio was taken from the home of the witness by police officers. This witness testified that on the night of the burglary of the radio store, both defendant and himself were armed with their revolvers; that he had never seen defendant when the latter was not armed with a revolver while on duty at night.

This witness testified that he was familiar with the premises and buildings known and described as the California Laundry. That on the night of January 6, or the early morning of the 7th, he was on duty with the defendant and drove to the laundry; that defendant said, "Let's stop here, I think I will go back and check this building back here." That defendant got out of the car and went back around the corner, returning in about five or ten minutes with a stack of white shirts, white towels and sheets, in his arms. That defendant put the articles in the back of the car saying, "I got myself some white shirts. I sure like white shirts." That they then drove to the alley in the rear of defendant's residence, whereupon, the latter took the articles into the building and when he returned did not have them with him. That at the time defendant left the car near the laundry and returned with the articles he was armed with a revolver. This witness further testified that on the night of April 28, 1946, and the early morning of the 29th, he and defendant drove to the vicinity of Ben's Market while on duty. That while driving along Willow Street they were stopped by a cab driver who advised them that there appeared to be a side window open in the market. The witness and defendant drove back to the front of the market and were able to see a window open on the west side of the building. That defendant said, "Let's go in and look around and see what we can find." They drove the police

car to the west side of the building and after alighting from the car, defendant walked up the steps back of a signboard which was close to the building, put his head in the window of the building, pushed the window, snapping the chains that held it, and entered. The witness followed defendant into the building through the same window. That at that time the defendant was armed with a revolver as was also the witness. After entering the building the two separated, the witness going into the front part of the market, while defendant remained in the rear. That defendant called the witness to the rear of the building and entered the office; that defendant pointed to a large quantity of coin wrappers of various denominations, saying, ''Look at all these wrappers.—It is too bad there is not any money.'' That at that time they looked into a tall desk with a top, observed more papers and coin wrappers but, according to the witness, did not see any money. That the witness then walked over to the refrigerator, removed four or five pounds of butter and stacked it up on top of a bin. When the witness started to pick up the butter, defendant said, ''Forget the butter . . . let's get out of here now.'' They then left the building by the same window through which they had entered. That defendant then said he thought they should leave a note to ''kinda make it look good.'' He then wrote the foregoing note on a form that he carried in his brief case and slipped it under one of the doors. They then left the premises. The witness testified that he had not seen the defendant take any money out of the market.

Loren Q. Martin, Captain of Detectives of the Long Beach Police Department and one of the investigating officers, testified that on September 6, 1946, he had a conversation with defendant wherein he asked the latter if he was acquainted with a man named Harry Brady, to which defendant replied in the affirmative, stating that he had known Mr. Brady for a long time. Captain Martin asked defendant if he had sold any sheets and towels to Mr. Brady, to which defendant replied that he had not. The witness then informed defendant that Mr. Brady was in an adjoining office and had told the officers that he had purchased some towels and sheets from defendant for some $22 and had given a check in payment therefor; that the check was in the possession of the police and bore defendant's endorsement. Thereupon, defendant denied that he had sold anything to Mr. Brady but that the latter had, from time to time, borrowed money from defendant and

that the check was for a loan. In this conversation, defendant denied that he had ever gone into the foregoing radio store or taken a radio therefrom. He also denied that he had ever sold or delivered a radio to George S. Fatino. Captain Martin then informed defendant that Mr. and Mrs. Fatino were in another office and had stated that they had purchased from defendant a radio-and-record player, then exhibited to defendant; that they had paid defendant $55 for the same; that this payment was made by a check for that amount; that the check, endorsed by the defendant, was in the possession of the police.

At that time defendant stated to Captain Martin that he desired to talk with him alone, and the latter asked other officers to withdraw from the room; that defendant stated it would be satisfactory to him for Lieutenant Tubbs to remain. According to the witness, upon the retirement of the other officers, defendant "then told me that if he would give him some kind of a break that he would help us clear up these burglaries that had been worrying us. And I told him that we would not give him any kind of a break." Subsequently, additional conversation was had in the presence of Captain Martin and Chief of Police Slaight in the latter's office, at which time Chief of Police Slaight told defendant, "The thing we are interested in right now is whether or not you took a radio out to George Fatino's house," to which defendant replied "that he took the radio out to Mr. Fatino's house and delivered it to him and received a check for $55.00 which he cashed and turned the money over to Officer Golson. He said that this was done at the request of Officer Golson." On cross-examination, the witness Captain Martin testified that when the defendant was on duty he was required to carry a gun at all times, and that under police regulations an officer is considered as being on duty 24 hours a day.

Detective Inspector Lloyd G. Wilson testified that he took the Truetone radio from the residence of Mr. Fatino to the police department. He also testified that he took another exhibit, a sheet, from the home of Mr. Brady, to the police department, and that both articles remained there until they were brought into court.

Detective Inspector Harry W. Boggess of the Long Beach Police Department testified that on September 7, 1946, he went to the home of defendant and took therefrom two shirts, which he brought to the police station, where they remained

until introduced into evidence at the time of the trial. He further testified that on September 8, 1946, he had a conversation with defendant in the sergeant's office of the Long Beach city jail, at which time the defendant's statements were freely and voluntarily made and were not made pursuant to any offer of immunity or hope of reward. That during the conversation Inspector Hepler was also present. That defendant stated that he had been accused of a lot of things and that "he wanted to get everything straightened out and he couldn't think clearly in that jail. He wanted to get out of that jail," and that if the witness would secure his release from jail "he would clear up a lot of things." Referring to certain shirts introduced into evidence, the witness Boggess testified that defendant first stated they belonged to him, but when the witness informed him that he knew the shirts were stolen from the California Laundry defendant then stated that he did not know whether all the shirts were his or not. Questioning defendant concerning a gray suit and some other garments, the witness told him that the owner of the Bee-Jack Cleaners had personally accompanied Inspector Anderson to defendant's apartment, had taken the garments from the apartment, and that they had all been identified, including the gray suit, the sport jacket and the sport shirt. To this defendant replied, "Well, I really don't know what I have got in that apartment over there. I have a lot of property in there." After defendant had told Inspector Boggess that he would "show him a lot of things" when he got outside of the jail, places that had been entered, Inspector Boggess and Inspector Hepler took him in their automobile for a tour of Long Beach. During the ride, Inspector Boggess told defendant that George Fatino had given defendant a check for $55 for a radio and that the witness didn't see how defendant could explain "his way out of that one." To this defendant said, "Well, I know, I know, I took the check but Golson gave me the radio." Referring to another radio, defendant then said, "The radio that you got out at Golson's house was also one that came out of the Nixon-Wallace Radio Shop." The two police inspectors then drove to the vicinity of the aforesaid radio shop, where Inspector Boggess told defendant that Golson had told him that he, Golson, had passed out in the car while defendant broke into the Nixon-Wallace Radio Store. To this statement, defendant responded that Golson was a damned liar saying, "Golson broke into the store and

handed me the radios out." Inspector Boggess then said, "You mean the Truetone radio that Mr. Fatino had, and the Majestic radio that I got out at Mr. Golson's home," to which defendant responded, "Yes. He knew what he was doing all the time." Inspector Boggess then said, "You were there when the radios were handed out, weren't you?" to which defendant replied, "I was standing outside and he passed them to me out there."

Defendant was then driven to the vicinity of the Bee-Jack Cleaners, where another conversation ensued, Inspector Boggess telling the defendant that Golson had informed him that defendant was the man that "had broken in, that he took his club, broke the back window out into the lavatory, reached in and unlocked the door, when they both went in"; that Golson had stated he did not get any of the clothing but that defendant got it all and took it to his home. In response to this statement defendant said, "Golson's a damned liar. I didn't get any of the clothing." Inspector Boggess then said, "Gran, I got one of the suits, the jacket and a shirt out of your apartment," and, according to Inspector Boggess's testimony, defendant replied, "If you did, I don't know how they got there."

Driving to Ben's Market, another of the burglarized places, Inspector Boggess asked defendant if he ever went into that place, to which he replied that he had never been there in his life, whereupon the inspector said, "Why, I have a card down there with your handwriting on it which says that you found this place open, you searched it and if there is anything missing for the owner to call the station," to which, according to the witness, defendant replied, "Oh, yes, we did; we found it open and left a card." Inspector Boggess then said, "Did you take anything out of there while you were in there?" to which defendant stated, "We never touched a thing." The witness testified that he then said, "What did you mean, 'we'?" The witness Inspector Boggess then testified as follows: "He says, 'Golson.' I say, 'Well now listen, I know different. I know that there was in the neighborhood of three or four hundred dollars taken out of that market in bills and rolled money' and, I says, 'I do know that you got your share of it.' He then told me that the money was taken to Golson's house and split up; that he got $160.00 of it, or approximately that much."

Defendant did not take the witness stand in his own behalf,

and his defense in the main consisted of the testimony of the witness Walter Housen who resided in the same building as defendant did, and who testified that on February 5, 1946, he was present when defendant purchased from a Mrs. Brazenda a radio, some sheets, and some towels for the sum of $55. This witness was unable to identify with certainty the radio allegedly purchased by defendant on that occasion, and was equally uncertain of the identity of the sheets and towels.

It should also be noted that the transaction testified to by this witness, involving the purchase of this radio, occurred some weeks prior to the date when the Nixon-Wallace Radio Shop was burglarized. No denial was made by defendant, nor was any evidence introduced by him in denial or explanation, of any of the foregoing evidence presented by the prosecution in support of the other burglaries charged against him.

■ Appellant first challenges the sufficiency of the evidence to sustain the guilty verdicts on the ground that the same is totally lacking in any corroboration of the testimony of the accomplice Golson, as required by section 1111 of the Penal Code. We deem it unnecessary to here reiterate the evidence, as we have hereinbefore narrated it in detail. Suffice it to say that when the testimony of the accomplice is eliminated, and the evidence of other witnesses as well as the entire conduct of appellant is examined, there is ample evidence to connect him with the commission of the crimes of which he was convicted. Though it be conceded that the corroborating evidence when standing by itself, is slight and entitled of itself to little consideration, it nevertheless does tend to connect appellant with the commission of the offenses. This is all that is required. Appellant's own statements and admissions, together with the facts related by the accomplice, can be sufficient proof of guilt to sustain the convictions. Appellant's statements to the police officers, the recovery of some of the stolen goods in his possession, and the sale by him of certain other stolen goods, all measure up to the requirements of section 1111 of the Penal Code. In determining the guilt of appellant, the jury was entitled to take into consideration the fact that he made no attempt by his own testimony to contradict, explain or deny any of the circumstances established against him, and that the only evidence offered by him was with reference to a transaction that occurred some two weeks before the property allegedly involved therein was stolen. The following cases enunciating the fundamental

principles of law applicable to the testimony of accomplices are more than sufficient to establish the sufficiency of the corroborating evidence in the case now engaging our attention (*People* v. *Bridges,* 73 Cal.App.2d 913, 914 [167 P.2d 793]; *People* v. *Willmurth,* 77 Cal.App.2d 605, 611 [176 P.2d 102]; *People* v. *Braun,* 31 Cal.App.2d 593, 600 [88 P.2d 728]; *People* v. *Tibbitts,* 35 Cal.App.2d 669, 672 [96 P.2d 812]; *People* v. *Knoth,* 111 Cal.App. 250, 253 [295 P. 577]; *People* v. *King,* 40 Cal.App.2d 137, 141 [104 P.2d 521]; *People* v. *Myers,* 1 Cal.App.2d 620, 624 [37 P.2d 191]; *People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354]).

■ Appellant asserts that the only evidence that he was armed with a deadly weapon at the time of the commission of the offenses of which he was convicted, was that furnished by the accomplice. There was testimony by appellant's superior officers in the police department that under the rules and regulations of the department, he was required to be armed with his service revolver at all times when he was on duty, and that, under the aforesaid regulations, a police officer was on duty 24 hours a day.

In the light of the rules governing the sufficiency of testimony corroborating the accomplice, we have no hesitancy in saying that the evidence given by appellant's superior officers permitted the drawing by the jury of inferences sufficient to furnish the necessary corroboration of the direct testimony of the accomplice that appellant was not only actually on duty but was armed in accordance with police regulations at the time he committed the offenses of which he was convicted.

■ Appellant next complains that the court erred in restricting the cross-examination of certain witnesses for the prosecution. Without enumerating the five specific instances called to our attention, we are satisfied that the contention is without merit. As to the first instance, the ruling was correct for the reason that the witness under cross-examination was not interrogated on direct examination concerning the accomplice Golson, regarding whom the questions objected to were asked. As to the second occasion, the objection was properly sustained, and counsel for appellant conceded that the subject matter of the interrogation was not gone into on direct examination. The objection referred to in the third instance was properly sustained on the ground that the question clearly called for hearsay answers. For the same reason the objections referred to in the fourth instance were properly sus-

tained. The fifth and final instance concerned the attempt of appellant's counsel to cross-examine the accomplice Golson with reference to whether he had "talked the facts of this case over with any member of the police department?" The objection was sustained on the ground that the question was immaterial and not proper cross-examination. While this and other questions similar thereto might have been allowed, nevertheless, from a reading of the entire cross-examination of the accomplice, we are convinced that the rulings did not operate to prejudice any substantial right of appellant, and do not, therefore, justify a reversal.

■ Appellant next asserts that the court erred in not limiting its instructions regarding possession of stolen property to "recent possession," stating that the court dealt with stolen property in but two instructions, that in defining burglary the court instructed the jury that "it would be wholly immaterial whether the defendant actually stole anything while in such premises or not." Appellant urges that "were that literally true, evidence of the possession of stolen property by the defendant would never be admissible to identify him with the burglary." A reading of this instruction in its entirety reveals that by it the court was not dealing with the possession of stolen property but was defining burglary and the elements thereof.

■ As to the second instruction, appellant complains that the court therein "omitted all reference to the time it was found in the defendant's possession," stating that "if a burglary was committed and" thereafter "the defendant was found in possession of property taken in the burglary, such is a circumstance of guilt." That it was prejudicial error for the court not to limit such possession to "soon after" the burglary. In so far as here pertinent the criticized instruction reads: "The mere possession of stolen property, *however soon after the taking* unexplained by the person having possession is not sufficient to justify conviction. It is, however, a circumstance to be considered in connection with other evidence in determining the question of innocence or guilt." We find no error in the instruction as given. The element of time elapsing between the burglary and possession of property stolen therein goes to the weight rather than the admissibility of evidence in that regard. We understand the law to be as stated by the court, that when a burglary has been committed, and the defendant is found in possession of the stolen prop-

erty, "however soon after the taking," such possession of the stolen property is a circumstance which, when unexplained, and taken in connection with other incriminating evidence in the case, may be considered by the jury in determining the question of the guilt or innocence of a defendant charged with the burglary, and the weight or intrinsic value of such evidence. of possession in the light of time elapsing between the burglary and the discovery of possession by the defendant is a question for determination by the jury (*People* v. *Russell*, 34 Cal.App.2d 665, 669 [94 P.2d 400] ; *People* v. *Shaw*, 46 Cal. App.2d 768, 771 [117 P.2d 34] ; *People* v. *McCann*, 34 Cal. App.2d 376, 377 [93 P.2d 643] ; *People* v. *Golembiewski*, 25 Cal.App.2d 115, 117 [76 P.2d 717]). The primary question is whether a defendant was found in possession of the stolen property under circumstances and conditions which justify the triers of fact in concluding that he was the guilty party in the burglary charged against him.

█ Appellant also attacks that portion of the instruction in which it is stated that the possession of stolen property would be a circumstance tending in some degree to show his guilt, asserting that the law attributes no such result to mere possession, but that "proof of such possession and guilty conduct" lends relevancy to the possession. That is exactly what the trial court stated to the jury, as a reading of the instruction in its entirety will readily indicate. We quote from the instruction:

". . . If you should find from the evidence that a burglary was committed on the premises involved in this case and that thereafter the defendant was found in possession, or claimed to be the owner, of property stolen from the burglarized premises, such a fact would be a circumstance tending in some degree to show guilt, although not sufficient, standing alone and unsupported by other evidence, to warrant your finding him guilty. In addition to proof of possession of such property thre must be proof of corroborating circumstances tending of themselves to establish guilt. Such corroborating circumstances may consist of the acts, conduct, falsehoods, if any, or other declarations, if any, of the defendant, and any other proved circumstances tending to show the guilt of the accused."

█ Appellant next challenges the correctness of six instructions given as to the law governing the corroboration of an accomplice. It would unduly prolong this opinion to here

set forth in detail the instructions in question. However, they clearly and correctly set forth the law applicable to the corroboration of an accomplice as required by section 1111 of the Penal Code, and are in conformity with the principles enunciated in a veritable forest of cases, including those hereinbefore set forth in support of our conclusion that, in the instant case, the evidence of the accomplice was adequately corroborated.

Although he requested no such instruction, appellant now contends that reversible error was committed by the court in failing to instruct the jury in accordance with section 1097 of the Penal Code, that if there was reasonable ground of doubt as to whether he was guilty of first or second degree burglary, he could have been convicted only of the lowest of such degrees. The court gave the code instruction on reasonable doubt; the code definition of burglary defined the degrees thereof, and instructed the jury that if they believed the appellant guilty of burglary beyond a reasonable doubt, they must find the degree thereof. There are two additional answers to appellant's contention in this regard. The first is that the admissible evidence was such that appellant must have been acquitted, had the jury not been satisfied beyond a reasonable doubt that he was guilty of burglary of the first degree. When the nature of the evidence is such as to warrant only a verdict for the higher offense or degree it is proper to refuse to instruct as to a lesser offense or degree (*People* v. *Tolli,* 93 Cal.App. 62, 64 [268 P. 1078]). Secondly, even though it be conceded that appellant was entitled to have the jury instructed in conformity with section 1097 of the Penal Code, no such instruction was requested by him, and he cannot now complain that it was not given. While the court is required, on its own motion, to instruct the jury on general principles of law pertinent to the cause on trial, an appellant cannot predicate a reversal upon the failure of the court, in the absence of a request, to instruct upon specific matters. Included in these matters requiring a request on the part of a defendant is an instruction as to lesser degrees of the offense charged. In the absence of such a request, the defendant is precluded from complaining of the failure of the trial court to give the same (*People* v. *Modina,* 146 Cal. 142, 144 [79 P. 842]; *People* v. *Dozier,* 35 Cal.App.2d 49, 60 [94 P.2d 598], and cases therein cited).

Appellant next contends that the judgment upon

counts II, III, IV and V "for burglary in the first degree are contrary to law in that there is no allegation in the amended information, no evidence that defendant, as a police officer, was not permitted to be armed on the occasions of the alleged burglaries." While it is difficult for us to follow appellant's reasoning on this point, his argument impresses us as being one contending that if a policeman commits a burglary while armed with his service revolver, which under police regulations he is required to carry, and which under the law he is permitted to carry, he is immune from prosecution and conviction of burglary of the first degree. In support of his argument, appellant refers to the Deadly Weapons Act (1 Deering's Gen. Laws, Act 1970, Stats. 1923, p. 695, and amendments) which exempts certain persons authorized to carry concealed deadly weapons from prosecution thereunder. But appellant was not charged with a violation thereof in this case. Appellant also refers to section 969(c) of the Penal Code which provides that when a defendant is armed under circumstances bringing him within subdivision 2 of section 1168 of the Penal Code (now found in § 3024 of the Pen. Code) and section 3 of the Deadly Weapons Act, prohibiting the possession of such weapons by certain persons, such charge shall be added to the indictment or information in the manner therein prescribed. In other words, appellant argues that the provisions of Penal Code, section 969(c) and the Deadly Weapons Act limits or modifies section 460 of the Penal Code, which defines the degrees of burglary. Were appellant's contention sound, it would mean that a police officer, or a person licensed to carry a concealed deadly weapon, could not be convicted of burglary in the first degree because he was so armed at the time of the commission of the crime. The mere statement of the appellant's contention is a sufficient answer thereto. Section 969(c) of the Penal Code and the foregoing sections of the Deadly Weapons Act were never intended to affect or modify section 460 of the Penal Code defining the degrees of burglary. They refer only to the question of increased penalties that may be imposed upon one who is armed with a deadly weapon at the time of his commission of or arrest for the commission of a felony charged against him. It is, therefore, not necessary in the prosecution for burglary, under section 460 of the Penal Code, to allege or prove that at the time of the commission of the offense the perpetrator thereof was not authorized, licensed, or the possessor of a permit to carry a deadly weapon.

Finally, appellant insists that the verdict and judgment of guilty under count V charging the crime of burglary is inconsistent with the not guilty verdict returned on count VI, charging the offense of grand theft. This claim is without merit. The two crimes of burglary and grand theft are not identical. The jury may well have believed that appellant entered the building occupied by Ben's Market with the intent to unlawfully and feloniously commit theft, as charged in count V, but that he did not steal therefrom the sum of $430 as charged in count VI. The essential elements of the crime of grand theft charged in count VI are not present in the crime of burglary set forth in count V.

In any event, under section 954 of the Penal Code as amended, where as here, separate and distinct offenses are charged, each must stand on its own merit and a verdict of either conviction or acquittal upon one such charge has no effect or bearing upon the other and separate count contained in the amended information (*People* v. *Amick,* 20 Cal. 2d 247, 250, 251, 252 [125 P.2d 25]).

The judgments are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied January 2, 1948, and appellant's petition for a hearing by the Supreme Court was denied January 15, 1948.