[Crim. No. 295.   Fourth Appellate District.—May 27, 1936.]

# THE PEOPLE, Respondent, v. MIGUEL ROMERO BACOS et al., Appellants.

Claude L. Chambers and Herman Allen for Appellants.

U. S. Webb, Attorney-General, and Paul D. McCormick, Deputy Attorney-General, for Respondent.

MARKS, J.—Defendants were charged with the crime of murder in the first degree, found guilty with the recommendation of life imprisonment and sentenced to the penitentiary. Their motions for new trials were denied and they have appealed from the judgments and orders.

At about 10 o'clock on the evening of September 8, 1935, Paul Arriola was shot to death by Jose Gonzales in an anteroom to Arriola's taxi dance hall in San Diego. Gonzales fled and was arrested in San Francisco about September 28th. He there made a statement to police officers that he killed Arriola in self-defense. He was returned to San Diego, made a like statement to police officers and a third of similar import to the district attorney.

About November 1st he was interviewed in the county jail by Johnnie Cabillio, a fellow countryman. Shortly thereafter he changed his story and made a statement to the district attorney wherein he said he had been hired by Miguel Romero Bacos and Mintee Savage to kill Arriola; that he had been promised about five hundred dollars but had only been paid seventy dollars.

Bacos and Mrs. Savage were arrested and charged with the murder of Arriola. Their preliminary examination was held on November 14th and Gonzales was called as a witness for the People. While under oath he repudiated his last statement to the district attorney and testified that he killed Arriola in self-defense and that Bacos and Mrs. Savage were in no manner connected with the killing. They were discharged for lack of probable cause.

During December, 1935, Gonzales had been tried for murder. He testified in his own behalf that he killed Arriola in self-defense and did not implicate either Bacos or Mrs. Savage. He was found guilty and sentenced to be hanged. His case is now pending on appeal in the Supreme Court.

While in the penitentiary he made statements to the warden that caused the case against Bacos and Mrs. Savage

to be reopened. They were rearrested and charged with the murder.

The preliminary examination was held in January, 1936, and Gonzales was again called as a witness for the People. At first he refused to be sworn, claiming he thought he had been brought to San Diego for his own second trial. After a short recess he was sworn and testified that defendants hired him to kill Arriola. He testified that for about a month prior to the murder both defendants had urged him to kill Arriola and promised to pay him if he did so. He detailed the events immediately preceding the killing as follows: That at about 9 o'clock on the fatal evening he entered a cafe owned by Mrs. Savage and consumed some wine; that Bacos, a bartender for Mrs. Savage, took him upstairs into a sitting room of a hotel operated by her, and later into a toilet; that Bacos gave him whiskey to drink, ten dollars in currency and a nickel plated revolver and asked him, "Why don't you shoot Paul Arriola?" and told him it was time to see if he had any "guts"; that Bacos said to him, "Come on, you go all right"; that Gonzales then went down stairs where Mrs. Savage said to him, "Why don't you go now and see if you got the guts?"; that he went to the taxi dance hall and killed Arriola.

Gonzales' accounts of his actions following the killing were as conflicting as those of his reasons for the murder. He disposed of the revolver by either leaving it in a trash burner in San Diego or throwing it in the ocean south of Long Beach. Early on the morning of September 9th he appeared at the house of a friend, one Medina, in San Diego, and sent word of his whereabouts to Mrs. Savage by one of her employees. She sent sixty dollars by this employee so that Gonzales might buy wine and beer. He walked to Long Beach and was later arrested in San Francisco.

Bacos and Mrs. Savage were held to answer and were placed on trial in the superior court on January 29, 1936. Their convictions rested entirely upon the testimony of Gonzales who was the only witness who directly connected them with the murder.

When Gonzales was first called as a witness for the People he detailed the events preceding the killing in accordance with the evidence he had given at the second preliminary examination of Bacos and Mrs. Savage, which we have just outlined. During the rest of the considerable time he spent

on the witness stand his evidence was composed of a bewildering maze of contradictions and flagrant perjury. He was thoroughly examined and cross-examined and his testimony in his own trial, where he claimed he killed in self-defense and did not implicate Bacos and Mrs. Savage, was read into the record, as was his evidence to the same effect given in the first preliminary examination of Bacos and Mrs. Savage. His evidence given at the second preliminary examination where he implicated these two defendants was also placed in evidence, as was his second statement, to the same effect, given to the district attorney. It was also made clear that in his statement to the police in San Francisco, to the police in San Diego, and in his first statement to the district attorney in San Diego, he claimed the killing was in self-defense and did not implicate the defendants. To make the confusion complete he testified at least twice in this trial, and before the jury that convicted Bacos and Mrs. Savage, that his statements and evidence to the effect that they had hired him to kill Arriola were false.

While being examined by the district attorney Gonzales testified as follows: "Q. And you say that when Mr. Blake Mason and Mr. Wagner took you up to state's prison at San Quentin, did they talk to you? A. Yes, sir. Q. You told them you would like to get a new trial, did you? A. I didn't talk to them. They are the ones that talked to me, sir. Q. I know, but they told you to just tell the truth, didn't they? Mr. Allen: Well, let him tell what they told him. A. I told him if I could get a new trial, I would tell the whole truth, all about what happened. By Mr. Whelan: Q. Well, now what is the truth, what is the real truth about this, Joe— where did you get the gun with which you shot Paul Arriola? Mr. Allen: Objected as repetition. The Court: Well, you might tell us over again. A. Well, the truth is this, sir, as you know in this case, a lot of people implicated, a lot of people that want to be in this case. I believe the third statement I signed, it is the truth. By Mr. Whelan: Q. This is this statement here (indicating) is the truth? The Court: People's Exhibit No. 8? A. Some of that, that is the truth. Some of that, there is the men that told me to tell it like that. Q. Well, is this the truth, did Bacos give you the gun, that is what I want to know? A. I tell you the truth, sir, that is not the truth that Bacos gave me the gun. Q. That

is not the truth? A. No, sir. Q. Has there been any attorney down in the jail to see you recently, Joe? A. No, sir. Q. None at all? The Court: Just answer out, answer yes or no. A. No, sir. By Mr. Whelan: Q. Well, you said when you were on the witness stand, you stated that Bacos gave you the gun? A. Well, I don't remember in this case, a lot of people are mixed up in this case, I don't know. Q. No, this is a direct question and doesn't have to—does not require any explanation from anybody but you yourself will either know whether Bacos gave you the gun or whether he didn't. A. Well, the trouble is this, I was in this already just the same. Q. The trouble is you want somebody to promise you a new trial so you won't have to hang, is that it? And nobody has promised that? A. No, sir, I am not asking for promises or anything and they sent me there and I went just the same and my case is not on appeal yet and I thought that is why they sent me here that I get a new trial. Q. How long had you been in San Diego, Joe, before you killed Paul Arriola? A. About three months, I guess, sir. Q. About three months? A. Well, a little over three months. Q. And what was your business or occupation? A. Why sometimes I used to work at the Coronado Hotel. Q. You only worked there a couple of days, didn't you, Joe? A. I worked about a week, still I worked there. Q. Mr. Gonzales, were you drunk the night that you killed Paul Arriola? A. No, sir. Q. What is that—had you had anything to drink? A. I had a little to drink. Q. And where did you get it, what did you have to drink, Joe? A. I drink wine, sir. Q. Anything else? A. No, sir. Q. What is that? A. No, sir. Q. Well, how about the story you told us here yesterday that Mr. Bacos and Mrs. Savage had taken you out on automobile rides and showed you where Paul Arriola lived, is that true? A. Why, I just told you that only because on account of that man by the name of Johnnie Cabillio, he had me talk some different questions. That is why I got mixed in this. Mr. Whelan: May we have an adjournment of about ten minutes, your Honor? The Court: The court will stand adjourned for ten minutes. We will take our afternoon recess and you are admonished under the same admonition heretofore given you, Ladies and Gentlemen of the Jury. Thereupon a short recess was taken. The Court: It may be stipulated that the jurors are all present in the jury box and the defendants are present in Court? Mr. Whelan: So stipulated by the People. Mr.

Chambers: So stipulated by the defendants. By Mr. Whelan: Q. Joe, what is the truth about this? A. The truth? The Court: You understand—we might go further— you understand this Court or the District Attorney or Sheriff of this county can under no circumstances grant you a new trial—do you understand that? Your case is on appeal to the Supreme Court. All that we want is the truth in this case. If these defendants are involved, we want the truth. If they are not, you tell us the truth and nothing but the truth—do you understand that? A. Yes, sir. The Court: All right. By Mr. Whelan: Q. All right, Joe, tell us the truth. A. Well, the truth is that they made me drunk and Bacos gave me the gun, sir.''

The record also shows the following, the portions in subquotation marks having been read to Gonzales from the transcript of his testimony at the first preliminary examination of defendants on November 14th where Gonzales exonerated the defendants: '' 'Mr. Mahedy: Your Honor: I prefer to interrogate the witness in the morning. The Court: Mr. Gonzales, the same crowd will be here tomorrow morning. You are not afraid to talk tomorrow morning? Joe Gonzales: I better talk now. The Court: It's pretty late now. Joe Gonzales: It takes about fifteen minutes to talk. The Court: But they will cross-examine you, too; come back tomorrow morning. Joe Gonzales: I am going to talk now. Maybe that man won't be here tomorrow. The Court: What man? Joe Gonzales: That man who— The Court: Someone in the court room? Joe Gonzales: There's a man by the name of Johnnie Cabillio— The Court: Who is Johnnie? Joe Gonzales: Right there. The Court: That man there? Joe Gonzales: Yes, sir. And this is the person that I was surprised that he come up and visit me in the jail house. I don't know why he is so interested about this case. The Court: Has he threatened you? Joe Gonzales: Yes, sir, because he tell me, You just lied, don't tell the truth—that you—I shoot Arriola—and he come and threat me and he try to put me to trouble. That's why I change my story to the District Attorney at that time, because he tell me he going to help me out of jail if I tell a lie. The Court: When did you first realize this? When did you first know of this? Joe Gonzales: That's the time when he come up and visit me. The Court: Has someone talked to you since then? Joe

Gonzales: No, sir, nobody come up and see me but this man. The Court: Just a minute. Well, I cannot force the prosecution to call this man as a witness. Ten o'clock tomorrow morning.' Mr. Whelan: That is objected to as being incompetent, irrelevant and immaterial and nothing to do with the issues in this case. By Mr. Allen: Q. (Continuing) Is that the way you testified in the court? Mr. Whelan: Just a minute— The Court: The objection is overruled. Answer whether or not you testified to that. A. Yes, I testified— that is the truth.''

We have read and reread the testimony of Gonzales. With all its confusion and conflicts one thing is clear, that he hoped to benefit in some way by aiding in the conviction of the defendants and that this belief found its origin in his conversation with Johnnie Cabillio in the county jail just before he made his second statement to the district attorney, in which, for the first time, he accused Bacos and Mrs. Savage of hiring him to kill Arriola. From many similar statements by Gonzales in the record we quote the following: '' 'Q. Did you say it Joe? A. Because there's a man tell me to tell that. Q. Did you tell us that? A. I tell lie. Q. You did, didn't you; and didn't you tell us that Bacos gave you a gun and ten dollars and a pint of whiskey and told you that when you killed Paul Arriola he and Mama would give you five hundred dollars more? Didn't you tell us that? A. Because there's a man there— The Court: Just a minute. Do you understand the question? Did you make that statement? A. I make that statement because they promised me something. The Court: Who promised you something? A. There's a man by the name of Johnnie Cabillio. The Court: But you made the statement, did you? A. He promised me to tell a lie, that's why I want this thing— The Court: What did he promise you? A. He come up in the county jail at three o'clock when they were serving supper to us, and I be surprised, it was three o'clock when they serve suppers to prisoner, and they say some one wants to see me, and I was surprised, he is only person he can come up and see me in the county jail. The Court: What did he promise you? A. He give me lots of talk, he say, ''How about all your story?'' I say, ''Listen, Johnnie, I don't want anything from you, when they got me in Frisco I tell my story, when I got in the city jail I just stick to my story self-defense.'' And this Johnnie Cabillio promise me, he.

said, "If you lie maybe I still could help you." So he tell me. "Maybe if you tell that somebody sent you to kill, like that, you may get out this trouble, this case, or maybe I have three big shots that I know here in San Diego too, Joe Robinson his name, colored people, Joe Robinson, and that Still, and that Sonny, he had money maybe I could get money from him and try to get the District Attorney, and at the present time you are doing your time in San Quentin like that, come up before the parole, and then you come outside." And I said, "I don't like that, to make those other people in this case, I don't want you to make me implicated with those two people in this case, those people don't know anything about this." And so he tell me, "Well, what did they know, they don't know anything about that, no people going to get mad on you, if you get outside and they want to do something to you then you can start again, have another shooting." And I tell him, "Gee, I thought you was going to help me, you was my friend." "Well, it is going to take easy to you," and besides that he tell me that the chief of police don't like him, and what they got to do me, because the chief of police want to put him in the back all the time. . . . ' "

In fairness it should be stated that there is no implication in the record that any officer of the law offered Gonzales any inducement or was in any way connected with any of the changes in his evidence. It is apparent that the police officers gathered what evidence they could and that the district attorney submitted the available evidence to the jury.

Gonzales had been an inmate in a naval prison and had received a dishonorable discharge from the Navy. The evidence shows him to be a perjurer and a confessed murderer. The other witnesses are not above reproach. Mrs. Savage was a "madam", and no praise can be given to the private life of Bacos. The search for the truth in the testimony of witnesses of that character is an impossible undertaking. Still a defendant cannot be convicted on the defects of his character alone. Evidence must be produced to prove guilt beyond a reasonable doubt.

The sole question raised on this appeal is the sufficiency of the evidence to sustain the verdicts and judgments. In one portion of his evidence Gonzales testified that he killed Arriola and was hired to do so by defendants. If this is to be believed the three persons were accomplices and the con-

victions cannot be sustained without corroborating evidence supporting the testimony of the accomplice.

The evidence relied upon to corroborate the testimony of Gonzales is as follows:

Defendants were shown to have been in possession of a nickel plated revolver before the murder, which was committed with a nickel plated revolver.

Bacos and Gonzales were seen together on the second floor of the hotel at about 9 o'clock on the night of the murder and Bacos was heard to say to Gonzales, "Come on, let's go".

Defendant Bacos went with two others to the office of an attorney who was engaged to represent Gonzales, one of the three paying the attorney thirty dollars on account of his fee. The money was not delivered to the attorney by Bacos and he is not shown to have entered into the conversation with the attorney. The money was provided by Mrs. Savage.

Mrs. Savage furnished the sixty dollars that was given Gonzales the day after the killing.

Both defendants made statements to witnesses advising them to keep their mouths shut or they might get into trouble.

No satisfactory motive why either defendant desired the death of Arriola was proven. While proof of motive is not essential to support a conviction it would have lent support to the people's case had one been established.

Section 1111 of the Penal Code provides that a defendant cannot be convicted on "the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense". The provisions of this section have been construed in many cases which it is not necessary to review here. The holdings of those cases favorable to the contentions of the Attorney-General are summarized in 8 California Jurisprudence, page 178, as follows: "Evidence to corroborate an accomplice need not be sufficient to establish the guilt of the defendant, and it need not establish the actual commission of the offense. Nor need it extend to every fact and detail covered by the statements of the accomplice, or to all the elements of the offense, or prove that the accomplice has told the truth. However, the corroborative evidence must tend in some slight degree, at least, to implicate the defendant. While it need not be strong, more is required by way of corroboration than to raise a mere suspicion. It is sufficient if the corroborating

evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to little weight.'' It must be admitted that there are many cases in which convictions of defendants have been affirmed where the evidence corroborating the testimony of the accomplice was no more full or complete than that in the instant case. However, in none of them was the accomplice so thoroughly impeached, his testimony so contradictory and so little worthy of belief as in the instant case. We have found no case where a conviction has been sustained where the accomplice admittedly committed perjury as to the most material parts of his testimony and twice in his evidence against the defendants in the very trial in which they were convicted repudiated the portions of his evidence upon which the conviction was had and under oath testified that such evidence was false. Surely in such a case the time honored admonition to the jury that ''A witness false in one part of his or her testimony is to be distrusted in others; that is to say, the jury may reject the whole of the testimony of a witness who has sworn falsely as to a material point; and the jury, being convinced that a witness has stated what was untrue, not as a result of mistake or inadvertence, but wilfully and with design to deceive, must treat all of his or her testimony with distrust and suspicion, and reject all unless they shall be convinced that he or she has in other particulars stated the truth,'' should be applied with all strictness.

Attention should be directed to two decisions of the Supreme Court in each of which it was held that evidence corroborating the accomplice was insufficient to support the conviction. (*People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478] ; *People* v. *Davis*, 210 Cal. 540 [293 Pac. 32, 38].)

In the Kempley case the accomplice, Agnes Kellar, was a woman of low character and the rule requiring the corroboration of her testimony with other evidence tending to connect the defendants with the *commission of the offense charged* was applied with considerable strictness.

What was said in the Davis case should be applicable here. ''Taking the testimony of the several witnesses offered in corroboration of the story told by Ben Getzoff (the accomplice), it is exceedingly doubtful whether any of it, or all of it together in and of itself amounts to corroborative evidence tending to connect the defendant with the commission

of the crime charged. In order to give it effect even as tending in that direction it seems at every point necessary to interpret and explain this 'corroboration' in the light of the testimony of Ben Getzoff. It requires the testimony of Ben Getzoff to give it direction to the alleged crime, before it can be said to connect the defendant with the commission of the crime. But the law requires that such testimony offered in corroboration of the testimony of an accomplice shall *of itself* tend to connect the defendant with the offense charged.''

Where an appellate court cannot say as a matter of law that one of the conflicting stories told by the accomplice on the witness stand is inherently improbable, but when the accomplice, before the jury which convicted defendants, testified at least twice that his evidence implicating them in the commission of the crime was false, and where he was otherwise so thoroughly impeached that little credence can be given his evidence, the corroborating evidence should ''connect the defendant with the commission of the crime'' (sec. 1111, Pen. Code) in a positive manner and not merely tend to corroborate some of the details of the incriminating story told by the accomplice.

Although the trial judge denied defendants' motions for new trials, that he entertained doubts of their guilt is shown by the following colloquy occurring at the time sentences were pronounced: ''The Court: No legal cause—as to the defendant, Miguel Romero Bacos, and as to the defendant, Mintee Savage, each of you have been heretofore convicted by a jury in this court of the crime of murder and they fixed the degree thereof as murder of the first degree and recommended life imprisonment for each of you. Of course it is out of my hands to do anything different than what the jury have recommended. It is beyond my control. The case, I assume, will be appealed to the upper courts and if they reverse the judgment, then you will be released. If it is affirmed and upheld, of course then you will be committed accordingly and it is out of my hands and it is no duty of mine to determine whether or not you are innocent or guilty. That is a matter that is left entirely to the jury and the jury have found that you are guilty.

''Defendant Savage: The next thing for me to do is to have that appealed, is it?

"The Court: Your attorney will take care of that and will do it, I take it. It then goes to a higher court on appeal. If it is reversed, then you will be released or a new trial had. There is considerable doubt about the value of the testimony of Gonzales, in my opinion. He changed his story so many times, it is doubtful."

■ In any trial a defendant is entitled to two decisions on the evidence,—one by the jury and one by the trial judge when he rules on the motion for new trial. (*Smith* v. *Royer*, 181 Cal. 165 [183 Pac. 660].) In so passing upon the sufficiency of the evidence he is not bound by conflicts in it (*Moyer* v. *Dresch*, 2 Cal. App. (2d) 655 [38 Pac. (2d) 849]), and it becomes his duty to then consider the credibility of the witnesses, their manner of testifying on the stand and the weight and sufficiency of the evidence. While he should not lightly set aside the verdict of a jury he should review the cause for a second time and only after such review decide the motion for new trial. (*Olinger* v. *Pacific Greyhound Lines*, 7 Cal. App. (2d) 484 [46 Pac. (2d) 774].) If, after reviewing the entire cause he deems the evidence insufficient to support the verdict he should not hesitate to grant the motion. Under the unusual circumstances of this case we believe the trial judge should have granted defendants' motions for new trial.

The judgments pronounced on both defendants, and the orders denying their motions for new trial, are reversed and new trials are ordered.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 8, 1936, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 25, 1936.