[Crim. No. 5467. In Bank. Oct. 23, 1953.]

THE PEOPLE, Respondent, v. WILFRED WELLS ROBARGE, Appellant.

Wilfred Wells Robarge, in pro. per., and Albert Garber, under appointment by the Supreme Court, for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

GIBSON, C. J.—Defendant, who admitted three prior felony convictions, was found guilty by a jury of robbery in the first degree. He appeals from the judgment and from an order denying his motion for a new trial, contending that the evidence is insufficient to support the verdict; that the district attorney was guilty of prejudicial misconduct; that his constitutional rights were violated by the police when, before trial, a pair of dark glasses was placed over his eyes at the suggestion of a witness who had been asked to identify him; and that the court misconceived its duty in passing on the motion for a new trial.

About 3 o'clock in the morning of March 5, 1951, the Clock Drive-In restaurant located in the county of Los Angeles was robbed by two men. One of the men entered the office of the restaurant, where the manager and the cook were checking the day's receipts, and announced, "This is a stick-up." With a gun in his hand he ordered the manager to open the safe and then directed him and the cook to lie down on the floor. The other robber, who was wearing a hat and dark glasses, met Manus, a dishwasher, as he was leaving the kitchen for the washroom, pointed a gun at him and ordered him to move to a place near the office door. This robber then saw Muldrow, the janitor, coming down the hallway and, after some exchange of words, forced him to join Manus. Muldrow and Manus were "backed" into the office and forced to lie on the floor with the cook and the manager. The robbers took $3,300, tore the telephone from the wall, and turned off the lights.

The cook and the manager, because of their positions on the floor, were unable to see the man who forced Manus and Muldrow to enter the restaurant office. The prosecution claims that this man, who will hereafter be referred to as "the robber," was defendant. Six weeks after the robbery Muldrow saw defendant at a police station and was asked by the officers if he could identify him. Muldrow answered that

if the man would put some glasses on, he "could tell more about him." The police officers placed a pair of dark glasses on defendant, and Muldrow then identified him as the robber. At the trial Muldrow testified that he had a "good look" at the robber in the hallway, and he was positive that defendant was the same man. Manus testified that defendant's features resembled those of the robber and that defendant appeared to be about the same height, but that he could not state positively that defendant was the robber.

Although defendant did not take the stand, there was testimony on his behalf that he was several miles away from the scene of the crime at the time the robbery was committed. A witness named Buttrey testified that he saw defendant that night at a place called Top's Café which was located approximately 10 miles from the Clock Drive-In. He said that defendant entered Top's Café about a quarter of 2, stayed 20 or 30 minutes and left alone. Defendant's former wife testified that at 20 minutes past 2 he picked her up at the place where she was working near Top's Café and drove her to her mother's home. She said that they parked in front of the house and stayed in the car from 2:30 until 4 o'clock. Her mother testified that she saw them there, recognized defendant, and waited for her daughter to come in.

 Defendant contends that the testimony of Muldrow was inherently improbable and that, therefore, there was merely an apparent conflict in the evidence which should not be resolved in favor of the verdict. When questioned at the preliminary hearing, Muldrow demonstrated by a gesture that the robber was a certain height, and according to statements in the record the height indicated was about 4 feet. At the trial Muldrow stated that the robber was about 5 feet 4 inches tall, and when asked to estimate the height of defendant, who of course was in the courtroom, he said, "Well, I would say he is five feet four." Defendant relies on the fact that the record shows that his height is about 5 feet 11 inches. Muldrow, however, in referring to the heights of defendant and the robber, used the identical figures of 5 feet 4 inches, and the jury may reasonably have concluded that he was confused by figures and did not know how to estimate the height of a person in feet and inches. Although his testimony is unclear and inconsistent in some respects, he made an unequivocal identification of defendant as the robber, and his testimony was corroborated to some extent by that of Manus, who testified that defendant was about the same height as

the robber, had similar features and looked like him. We cannot say as a matter of law that the evidence is insufficient to support the judgment.

■ The asserted misconduct of the district attorney occurred during the examination of the witness Buttrey and consisted of asking questions the purpose of which, according to defendant, was to implant in the minds of the jurors the idea that defendant's brother was the other participant in the crime. As we have seen, Buttrey testified that he saw defendant at Top's Café on the night the robbery was committed. On cross-examination the district attorney asked him who was with defendant at the café. Buttrey answered that the defendant and his brother, Jimmy, came together and that Jimmy remained at the café after defendant left. The district attorney also questioned the witness as follows: "Q. When did you first hear that the Clock Cafe down on Atlantic Boulevard by Florence had been stuck up? A. At the time that the two boys were picked up; shortly after that, when they were missing. Q. That was long about the latter part of April? A. That's right. Q. And you didn't hear about this stick up or hold up at the Clock Cafe until after you heard that the boys had been arrested. A. That's right." No objection was made to any of the questions, and no motion was made to strike any of the answers.

The prosecution was entitled to explore defendant's alibi and to question the witness with respect to the persons who were in the café at the time he said defendant was there. There is nothing in the record to indicate that, when the district attorney asked the witness concerning the time he first learned of the robbery, the answer would bring before the jury the fact that defendant's brother had been arrested with him. Under the circumstances, we find no misconduct on the part of the district attorney.

■ Defendant further contends that the action of the police in placing dark glasses on him at the time he was identified by Muldrow at the police station was in violation of his constitutional rights. In this connection it may be noted in passing that defendant made no objection to Muldrow's testimony upon the ground that his identification might be based in part upon what occurred at the police station. Defendant relies solely on *Rochin* v. *California* (1952), 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], in support of his contention that he was deprived of his constitutional rights. That case was extensively reviewed

in *People* v. *Haeussler, ante,* pp. 252, 255 et seq., where this court stated at page 259 [260 P.2d 8]: "In brief, the Rochin case holds that brutal or shocking force exerted to acquire evidence renders void a conviction based wholly or in part upon the use of such evidence." In the present case there is no evidence whatsoever of brutality or shocking conduct. In fact, there is nothing to show that force was used when the glasses were placed upon defendant, and, for all that appears, he may have consented to what was done.

The final contention of defendant is that the trial court misinterpreted its duty and erroneously denied his motion for a new trial solely because it felt bound by the jury's decision on the evidence. ██ While it is the exclusive province of the jury to find the facts, it is the duty of the trial court to see that this function is intelligently and justly performed, and in the exercise of its supervisory power over the verdict, the court, on motion for a new trial, should consider the probative force of the evidence and satisfy itself that the evidence as a whole is sufficient to sustain the verdict. (*People* v. *Knutte,* 111 Cal. 453, 455 [44 P. 166]; *People* v. *Lum Yit,* 83 Cal. 130, 133-134 [23 P. 228]; *Estate of Bainbridge,* 169 Cal. 166, 168-170 [146 P. 427].) ██ It has been stated that a defendant is entitled to two decisions on the evidence, one by the jury and the other by the court on motion for a new trial. (*People* v. *Sarazzawski,* 27 Cal.2d 7, 15-16 [161 P.2d 934]; *People* v. *Cesena,* 18 Cal.App.2d 727, 729 [64 P.2d 732].) This does not mean, however, that the court should disregard the verdict or that it should decide what result it would have reached if the case had been tried without a jury, but instead that it should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. (*Estate of Bainbridge,* 169 Cal. 166, 168-170 [146 P. 427]; *Green* v. *Soule,* 145 Cal. 96, 103 [78 P. 337]; *People* v. *Richard,* 101 Cal.App.2d 631, 633-634 [225 P.2d 938]; *People* v. *Mallicoat,* 27 Cal.App. 355, 358 [149 P. 1000].)

██ In passing upon a motion for a new trial the judge has very broad discretion and is not bound by conflicts in the evidence, and reviewing courts are reluctant to interfere with a decision granting or denying such a motion unless there is a clear showing of an abuse of discretion. ██ In the present case it clearly appears that the trial court misconceived its duty under the foregoing authorities and, for that reason,

634

failed to give defendant the benefit of a proper review of the evidence. In ruling on the motion the court stated that it was mindful of "the rule that the jury are the sole judges of the credibility of the witnesses. It adheres to that rule to the extent that even though the Court disbelieves what the witnesses may have said, if there is sufficient evidence upon which the jury may base their decision, even though the Court sits as a thirteenth juror, it is not in a position to upset the verdict of the jury."

The statement by the trial judge that "the Court sits as a thirteenth juror" has an unfortunate connotation; the phrase is misleading, and it does not properly describe the function of the trial judge in passing upon a motion for a new trial. As we have seen, it is the province of the trial judge to see that the jury intelligently and justly performs its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.

After reviewing the testimony of Muldrow, who was the only witness to identify defendant positively, the trial court said that there were inconsistencies that "were awfully hard for the Court . . . to believe." It compared his testimony with that of Manus, who had the same opportunity as Muldrow but was not able to identify defendant as the robber, and pointed out that Manus was a much better witness than Muldrow. The court then stated that "Those are the things that were given to the jury and the jury, under the instructions of the Court and under the law, [were] the sole judges of the credibility of witnesses and the determiners of the facts. If there is any evidence upon which they have the right to base their conclusion, this Court is not in a position where it could upset it." Other remarks show clearly that the trial court disbelieved much of Muldrow's testimony and entertained serious doubts as to the validity of his identification of defendant, but the court nevertheless indicated at least three times that it was bound by the contrary conclusion of the jury. It is therefore evident that the trial court failed to give defendant the benefit of its independent conclusion as to the sufficiency of credible evidence to support the verdict. (See *People* v. *Sarazzawski*, 27 Cal.2d 7, 15-16 [161 P.2d 934]; *People* v. *Navarro*, 74 Cal.App.2d 544, 553-555 [169 P.2d 265]; *People* v. *Bacos*, 14 Cal.App.2d 338, 348-349 [58 P.2d 221]; *cf. People* v. *Richard*, 101 Cal.App.2d 631, 633-634 [225 P.2d 938].)

The judgment and the order denying the motion for a new trial are vacated with directions to again hear and determine the motion for a new trial in accordance with the rules hereinabove stated. If the trial court determines that a new trial should be granted, defendant will be entitled to a trial on the merits, but if it is determined that the new trial should be denied, then the trial court shall again pronounce judgment upon defendant. (See Pen. Code, §§ 1168, 1191, 1193, 1200, 1202, 1207 and 1213.) The time limits provided for in the sections just cited shall run from the filing of the remittitur in the superior court.

Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I concur in the conclusion reached in the majority opinion and generally in the reasoning upon which it is based. I do not, however, concur in the implication that *People* v. *Haeussler, ante,* p. 252 [260 P.2d 8], is distinguishable from *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], and it is my view that the same rule is applicable to the Haeussler case as was applied by the Supreme Court of the United States in the Rochin case, and the Haeussler case should have been reversed by this court. However, for the reasons stated in the majority opinion such rule is not applicable to this case.

Since this is the first case since I have been a member of this court in which the inept statement is made that in passing on a motion for a new trial "the Court sits as a thirteenth juror," I am constrained to call attention to the absurdity of this statement. There is not a scintilla of logic or common sense in the statement that "the Court sits as a thirteenth juror" in any judicial proceeding. In the first place the judge is not the court but is the officer who presides over the court. The court consists of not only the judge but also of the various attachés such as the clerk, bailiff, reporter, etc. and even counsel who participate in the court proceeding. (14 Am.Jur., p. 247, § 2.) A thirteenth juror would have no more power than any other juror—a voice and a vote in the formation of the verdict—while the court, in passing on a motion for a new trial, has the power to overrule the entire jury, set aside its verdict and grant a new trial in whole or in part before another jury. No such power ever has been, and I dare say never will be, vested in a "thirteenth juror."

There should be no doubt whatever, that under the traditional rule, a trial court in passing on a motion for a new trial made upon the ground of the insufficiency of the evidence to support the verdict, has the power, and it is its duty to vacate and set aside the verdict and grant a new trial in every case in which it is of the opinion that a fair and just verdict has not been reached. And certainly, if the court entertains a serious doubt as to the credibility of witnesses for the prosecution whose testimony is essential to establish the guilt of the defendant, this power should be exercised and a new trial granted. From the remarks of the trial judge in the case at bar it strikes me that this is a case in which this power should have been exercised.