Filed 9/1/15  P. v. Lartigue CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT LARTIGUE,<br><br>    Defendant and Appellant. | B256903<br><br>(Los Angeles County<br>Super. Ct. No. TA130046) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kelvin D. Filer, Judge.  Affirmed.

Caneel C. Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Garett A. Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Robert Lartigue (Lartigue) was charged with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)); count 1)[1] and possession of ammunition by a felon (§ 30305, subd. (a)(1)); count 2). As to both counts, it was alleged that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(A)). In addition, also as to both counts, it was alleged that he served two prior prison terms (§ 667.5, subd. (b)). He was convicted on both counts and sentenced to four years in state prison.[2] On appeal, he contends the trial court applied the incorrect standard when denying his motion for new trial, and therefore the case must be remanded for reconsideration. In addition, he requests that we conduct an independent review of the in camera hearings on his *Pitchess*[3] motion and remand the case for a further hearing if we conclude that the trial court failed to disclose appropriate discovery.

We find no error and affirm.

## FACTS

**Lartigue's Plea; the *Pitchess* Rulings; Dismissal of the Gang Allegation**

At arraignment, Lartigue pleaded not guilty to both counts. About a month later, he filed a motion seeking *Pitchess* discovery regarding four categories of information related to Los Angeles Police Department Officers Jonathan Chandler and Carlos Gonzalez, including citizen complaints against those officers and transcripts of testimony of persons who testified at any Civil Service Commission wherein the officers were accused of specified types of misconduct. At the same time, Lartigue filed a motion to dismiss the gang allegation.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] He received the mid-term of two years on count 1, plus two years for the prison priors. As to count 2, he received the mid-term of two years, which was stayed pursuant to section 654.

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

2

The trial court granted the *Pitchess* motion as to false statements and false police reports, and held an in camera hearing. It determined that discoverable materials existed, and ordered them turned over to the defense.

At a subsequent hearing, the trial court granted Lartigue's motion to dismiss the gang allegation.

In the midst of trial, the trial court and the parties discussed whether Lartigue was entitled to discover Civil Service Commission Board of Rights materials related to proceedings against Officer Chandler. After reviewing the materials, the trial court ordered discovery of an audio recording of an encounter between Officer Chandler and Joe Yanez (Yanez).

**Prosecution Evidence**

*The Crimes*

In the evening of September 12, 2013, Officer Chandler and Officer Gonzalez were patrolling. Five black males were loitering in front of an apartment complex on South Broadway, and they appeared to be drinking alcohol. The officers decided to investigate.

The complex had two apartment buildings facing each other with an open-air corridor down the center. There was a gated entrance on both ends. While Officer Chandler approached the men in the front of the complex, Officer Gonzalez went through an alley and entered the complex through the rear gate to prevent the suspects from escaping.

Lartigue was in the open-air corridor, and he had his back toward Officer Gonzalez, who was about 25 feet away.

Someone with a male voice shouted, "Police, police." Lartigue quickly turned his body, revealing his profile to Officer Gonzalez. At that point, Officer Gonzalez saw Lartigue grab his waistband with his right hand, and pull out a black, full-sized revolver. Officer Gonzalez saw the revolver "clearly" and recognized it "immediately."

3

Officer Gonzalez called for backup, saying "man with a gun."[4] Lartigue went to a cinderblock stairwell and tossed the revolver underneath it. No one else was around at the time.

Lartigue turned around and began walking toward the rear entrance. At that point, he made eye-contact with Officer Gonzalez, who was wearing his uniform. Officer Gonzalez got a "full frontal view" of Lartigue and saw his face. As testified by Officer Gonzalez, Lartigue "had a very nervous expression on his face of surprise of me being there." Next, Lartigue turned around and quickly walked toward the front of the complex and out the gate. According to Officer Gonzalez, he used hand and arm signals to tell Officer Chandler to handcuff Lartigue.

When Lartigue came through the gate, Officer Chandler told him to stop. Lartigue tried to walk away. Officer Chandler grabbed Lartigue and turned him around to be handcuffed. As soon as Officer Chandler reached for his handcuffs, Lartigue broke loose and ran away.

While running, Lartigue kicked his shoes off and threw his sweatshirt in the street. Officer Chandler pursued Lartigue on foot as he ran northbound on a diagonal across Broadway and turned Eastbound on 110th Street. Although Officer Chandler could not catch up with Lartigue, he was able to maintain visual contact until Lartigue climbed over a cinderblock wall at the property on the corner of the Broadway and 110th Street intersection.

Contemporaneously, back at the apartment complex, Officer Gonzalez recovered the revolver from the stairwell and put it in his back pocket. He began chasing Lartigue and broadcasting their direction of travel to responding units. When asked if he lost sight of Lartigue, Officer Gonzalez stated that he lost sight of Lartigue "quite a bit of times." Defense counsel asked Officer Gonzalez to quantify those times, and he stated: "Well,

---

[4] We note that Officer Chandler testified that Officer Gonzalez called for back up at a subsequent point in time, i.e., when Officer Chandler was trying to apprehend Lartigue. It is unclear from the record whether this is an inconsistency in the testimony, or if Officer Gonzalez call for back up twice.

4

just like any reasonable individual when you're running across a major boulevard[,] I am definitely going to look for traffic, double check the sign of the street, and things of that nature. I can't lock eyes with him because I can't get hit by a car."

During the pursuit, Officer Gonzalez saw Lartigue's sweatshirt and shoes lying in the street next to a median.[5]

Officers established a perimeter around the area where Lartigue had jumped over the cinderblock wall, and also established a command post. Canine units arrived and dogs located Lartigue in the side yard of a property that was just south of the corner property. Lartigue was identified by Officer Gonzalez and Officer Chandler as the suspect who had tossed the firearm and ran, and Lartigue was handcuffed. He was out of breath, sweating profusely, his clothing was torn and stretched, he was covered in debris, and he had a laceration on his shoulder.

According to Officer Chandler, he and Officer Gonzalez went back to the address where they first encountered Lartigue to look for evidence. They did not find the discarded shoes and gray sweatshirt. However, Officer Gonzalez denied trying to retrieve these items.

*Descriptions of Lartigue*

At trial Officer Gonzalez, testified that when he first saw Lartigue, he was wearing a "very light" gray sweater and blue or black basketball shorts.[6] He had a "very short

---

[5] During the preliminary hearing, Officer Gonzalez was not asked about, nor did he testify about, the discarded clothing. At trial, Officer Gonzalez was cross-examined at length as to whether he told anyone other than Officer Chandler that Lartigue had discarded clothing. In general, Officer Gonzalez said he did not recall. He said he did not feel the need to tell anyone, and he did not mention the discarded clothing in his police report.

[6] At the preliminary hearing, on cross-examination, Officer Gonzalez was asked what Lartigue was wearing when he was standing in the open air corridor in the apartment complex. Officer Gonzalez stated: "He was wearing a gray sweatshirt with a zipper and . . . it looks like some basketball shorts. I don't recall the color." When asked if the shorts were either blue or black, and whether they were dark, Officer Gonzalez agreed they were dark.

afro." Officer Gonzalez later stated that Lartigue was wearing a light gray sweatshirt. As for Officer Chandler, he testified that when Lartigue came out of the front gate at the apartment complex, he was smoking a cigarette, and he was wearing a black hat, a light gray sweatshirt, a black and gray polo shirt with a color, and a dark pair of shorts. During the defense case, the parties stipulated that if Officer Gonzalez was called to the stand, he would testify that the man in the gray sweatshirt was not wearing a black hat or smoking a cigarette.

A one-page document entitled "Incident Recall" reflected that in a broadcast to responding units, Officer Gonzalez described Lartigue as follows: male Black, thin build, white shirt, and blue shorts.[7]

Officer Gonzalez testified that when Lartigue was detained, he was wearing a black shirt and black shorts. Officer Chandler testified that Lartigue was wearing socks but no shoes.

*The Revolver*

The revolver was fully loaded with six rounds, and was in complete working condition. It had a rubber handle. A print specialist was unable to recover any fingerprints.

**Defense Evidence**

Yanez testified on behalf of the defense. Four years prior to trial, Officer Chandler stopped Yanez for not coming to a full stop at a stop sign. Yanez was not arrested or cited. However, he testified that Officer Chandler told him, "Shut up, smart ass," and made other remarks. When Yanez was asked if Officer Chandler was "unpleasant to you, or rude," Yanez stated, "To me it was more than unpleasant. It was

---

[7]    During cross-examination, Officer Gonzalez was asked why he broadcasted that Lartigue was wearing a white shirt when Officer Gonzalez had seen a gray sweatshirt. He testified, "when you're in [a] foot pursuit and chasing someone[,] it's a spontaneous broadcast, it's not by any means detailed or 100 percent accurate. In the sense that's just a preliminary broadcast to notify your partners out in the field and responding units of what you have, most importantly with the suspect is wanted for, course of travel, and description of the individual."

almost like a personal attack. Yanez complained to the Los Angeles Police Department about Officer Chandler's behavior, and later, via a phone call, described the incident to internal affairs.

**Lartigue's Motion for New Trial**

After Lartigue was convicted, he moved for a new trial based on section 1181, subdivision (6) on the ground that the verdict was contrary to the evidence. According to Lartigue, the trial court was required to act as the 13th juror and grant the motion if it would have decided the case differently.

To support his motion, Lartigue stated: "Both officers gave descriptions of the suspect that were internally and externally inconsistent. The descriptions at trial differed from previous descriptions, from each other and from the facts. Officer Gonzalez's original description[,] a male black, thin build, white shirt and blue shorts was inconsistent with his preliminary hearing testimony as well as his trial testimony. Officer Gonzalez never made any mention at the preliminary hearing that the suspect he was chasing discarded his clothing. In fact, Officer Gonzalez only admitted to making a prior inconsistent identification after he was confronted with the description he gave to the dispatcher. Further, Officer Gonzalez made no mention at [the] preliminary hearing that when he identified Mr. Lartigue over an hour later, he was wearing different clothing (i.e.[,] a black shirt).

"In addition, at trial he specifically contradicted the description given by Officer Chandler. Officer Chandler testified at trial that, as he exited the gate, the suspect was wearing a hat and smoking a cigarette. Officer Gonzalez indicated[] the person he saw with the gun did not have on a hat nor was he smoking a cigarette.

"At trial, [the officers were cross-examined] regarding the new claims of 'discarded clothing.' One officer testified that they did not go back to look for the clothing[, and the other officer] testified [that] . . . they went back for the express purpose of looking for the discarded clothing."

In conclusion, Lartigue argued: "The evidence which was adduced at trial was insufficient to support a finding of guilt because the testimony [of] Officers [Gonzalez] and [Chandler] was false, inconsistent and untrustworthy."

The prosecutor opposed the motion. She stated that the trial court must weigh the evidence independently, but also stated that the trial court must start with a presumption that the verdict was correct, and it must deny a new trial motion if the verdict is supported by substantial evidence. Based on that standard, the prosecution argued that the evidence was sufficient when viewed in a light favorable to the prosecution, and any "rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." In urging her position, the prosecutor noted that Officer Gonzalez was about 10 feet away when he saw Lartigue take the firearm out of his waistband and place it under the stairwell, Lartigue was the only person in the area, Officer Gonzalez made eye contact with Lartigue before fleeing, Officer Chandler saw Lartigue and attempted to handcuff him, both officers positively identified Lartigue at the scene and in court, and Lartigue was found hiding in the area where police suspected he would be based on Officer Gonzalez's broadcasts.

At the hearing, defense counsel argued, among other things, that "[t]his is a identification case, and I think that the jury for some reason glossed over the . . . inconsistencies [.]" In summation, she argued that there was "insufficient evidence to find [Lartigue] guilty."

Following argument by counsel, the trial court said: "I'm very familiar with what the witnesses said. I'm very familiar with the law in this area. And let me just point out, I think that it cannot be ignored that the officers, their identification was that they saw his face. And Officer Gonzalez specifically said he had a clear view. He saw [Lartigue's] face immediately. He said there was no one else in the area. He grabbed his waistband, took out a revolver, and clearly, that is what the officer said he saw. And the revolver was located in the location where [Lartigue] was.

"And as both [counsel] pointed out, [Officer Gonzalez] called in and requested one of the other officers to detain [Lartigue]. That officer also identified [Lartigue] by

8

his face, said it was him by looking at his face. A chase ensued as counsel pointed out, and during the course of that chase there were many opportunities where they lost sight of him. So there was a chance he could have changed clothes or discarded clothing. [¶] In fact, as the witnesses said, they saw him discarding his clothing. . . . And the inconsistencies that the defense established . . . [were] brought out either in cross-examination or through another witness on direct examination. And that was presented to the jury. And the jury had an opportunity to consider those inconsistencies. [¶] But they found that there was sufficient evidence to establish that the identification was correct. . . . [V]ery little is needed to sustain a conviction based primarily on prior inconsistent statements. . . .

"So even though we had some inconsistencies in terms of what the person may have been wearing at one point in time, again, that's not enough to warrant granting of a new trial. And . . . there have been cases where witnesses have changed their identification and recanted their identification, . . . but even that alone is not enough to warrant a motion for granting a new trial. . . .

". . . [T]he court cannot arbitrarily reject [the] verdict [if] it is supported by substantial evidence. And here, the fact that we have two eyewitnesses who identified [Lartigue], we have him being specifically seen with a gun. We have evidence he discarded his clothing. We have flight, that he ran, and we have the fact that the gun was recovered. That amounts to substantial evidence.

"And I would also point out that there's a specific jury instruction. . . . That any fact finder can notice that two people witnessing the same event may see or hear it differently. And the fact the officer saw something different or observed something different, testified about it differently, does not detract from their identifications, particularly that they identified his face.

"And I.D. is always an issue and can be a strong argument, particularly when you have situations where eye witnesses who are trying to identify someone after a passage of time, or maybe from a photograph or in a field show-up or something along those lines.

9

But here these officers actually witnessed the crime being committed. Both crimes being committed in their presence. And really, the challenge here is to the color of the clothing and whether he was wearing a hat. [¶] But the witnesses never wavered in the identification that it was [Lartigue]. There may have been changes in what he was wearing, but they all said it was him. And the court's duty in this instance is to verify the jury performed its duty, and whether there's sufficient credible evidence to sustain their verdict. [¶] And you're correct the court does sit as a 13th juror, but using the guidelines laid out in [the] authorities[,] I'm going to deny the motion for new trial based on insufficiency of evidence."

This timely appeal followed.

## DISCUSSION

### I. Any Error Regarding the New Trial Motion was Harmless.

Lartigue contends the trial court failed to independently analyze the evidence presented at trial, and this requires reversal per se. Assuming that there was error, we conclude that it was harmless.

### A. Applicable Law; Standard of Review.

Under section 1181, subdivision (6), a new trial may be granted when the verdict is contrary to the evidence. The trial court "extends no evidentiary deference in ruling on a . . . motion for new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.' [Citations.] If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to [the] . . . evidence.' [Citations.] In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal. Thus, the grant of a section 1181[, subdivision (6)] motion is the equivalent of a mistrial caused by a hung jury. [Citation.]" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.)

""""A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion."'' [Citations.]" (*People v. Thompson* (2010) 49

10

Cal.4th 79, 140.) An abuse of discretion will be found when a trial court applies the wrong legal standard to the issue under consideration. (*Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1494–1495.) In particular, it errs when it failed to "independently consider the weight of the evidence." (*People v. Carter* (2014) 227 Cal.App.4th 322, 328 (*Carter*).)

The parties dispute the consequence when a trial court applies an incorrect standard when denying a new trial motion.

The People point out that in *People v. Braxton* (2004) 34 Cal.4th 798, 816–817 (*Braxton*), our Supreme Court held that a trial court's refusal or failure to hear or determine a motion for new trial requires reversal only if there is a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. Under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), a miscarriage of justice is established if a defendant shows a reasonable probability he would have obtained a more favorable result if the error had not occurred. Using *Braxton* as a springboard, the People urge that an abuse of discretion flowing from a trial court's use of an incorrect legal standard requires reversal only if it is *Watson* error.

Citing *Carter* and *People v. Robarge* (1953) 41 Cal.2d 628, 635 (*Robarge*), Lartigue advocates a rule of reversal per se.

In *Carter*, the trial court heard a motion for new trial. Based on his review of the weight of the evidence and witness credibility, the trial court indicated his belief that the prosecution did not bear its burden of proving that the defendant committed burglary. Nonetheless, the trial court erroneously concluded that the verdict could not be assailed because it was supported by substantial evidence. Rather than remand the case for further consideration of the motion, the appellate court ordered a new trial. It stated: "Given the [trial court's] repeated statements that he had a reasonable doubt whether Carter committed the crime and that Carter was not 'the right man' in view of the alibi evidence, it serves no purpose to remand the matter for another new trial hearing." (*Carter*, *supra*, 227 Cal.App.4th at p. 29.)

11

Similarly, in *Robarge*, the trial court harbored serious doubt as to whether the evidence sufficiently identified the defendant as the robber, but it denied the new trial motion on the theory that "it was bound by the contrary conclusion of the jury." (*Robarge*, *supra*, 41 Cal.2d at p. 634.) *Robarge* ordered the trial court to hear and determine the motion under the proper standard. (*Id*. at p. 635.)

We opt to employ the harmless error rule. If *Watson* applies when a trial court does not decide a new trial motion, it should apply when a trial court denies a new trial motion via an incorrect standard. In both instances, the reviewing court is equally capable of reviewing the motion, opposition and evidence adduced at trial to determine whether there was prejudice. Thus, we conclude that *Braxton* supports the application of *Watson* here. Our holding does not conflict with *Carter* or *Robarge*. Significantly, they did not discuss whether per se reversal was required, and cases are not authority for propositions not considered. (*People v. Smith* (2014) 60 Cal.4th 603, 621–622.) We further note that *Carter* and *Robarge* involved defendants who were prejudiced by the failure of the trial courts to apply the correct standard, i.e., because the trial courts strongly indicated disagreement with the jury, it was reasonably probable that the defendants would have secured a different outcome absent error. Thus, they cannot be read as implying per se reversal.

B. Application of *Watson*.

If it had applied the correct standard, the issue for the trial court would have been whether it believed the prosecutor proved Lartigue's identification beyond a reasonable doubt. A review of the hearing on Lartigue's new trial motion establishes that the trial court believed that the identification evidence was particularly strong because the two officers witnessed the crimes being committed, they saw Lartigue's face, and they never wavered in their identification of him. Moreover, the transcript establishes that the trial court did not believe the inconsistencies in the evidence regarding the color of Lartigue's shirt (whether it was a gray sweatshirt, a white shirt or a black shirt), and regarding whether Lartigue was wearing a hat, were significant. Given this, we conclude that any error did not affect the trial court's ruling.

12

**II.  Independent *Pitchess* Review.**

Lartigue moved for discovery of personnel information relating to Officers Gonzalez and Chandler.  (*Pitchess*, *supra*, 11 Cal.3d 531.)  On appeal, Lartigue requests that we review the transcript of the *Pitchess* hearings to determine if any additional discoverable materials were withheld.

Our independent review reveals that the trial court properly exercised its discretion when determining what personnel records should be disclosed.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
       ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.
      CHAVEZ