Filed 2/17/23 P. v. Olivo CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076089 |
| v. | (Super.Ct.No. FMB19000094) |
| WILLIAM ENRIQUE OLIVO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Bridgid M. McCann, Judge. Affirmed.

Patricia A. Scott, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant, William Enrique Olivo, was staying at the apartment of a friend from his time in the United States Marines. While there, Olivo threatened to beat up a woman who was also staying at the apartment. The woman locked herself in a bathroom and called her boyfriend. When the boyfriend arrived and confronted Olivo, asking repeatedly if there was a problem, Olivo threw his beer at the man and started a fight by tackling him. The fight ended when Olivo stabbed him several times. One stab wound severed an artery and was fatal. A jury convicted Olivo of second degree murder, criminal threats, and dissuading a witness.

Olivo raises two challenges to his murder conviction. First, he argues the People put on insufficient evidence he acted with malice, either express or implied. Second, he argues the People put on insufficient evidence to disprove he acted in imperfect self-defense or heat of passion after being provoked. We conclude the second degree murder conviction is adequately supported by evidence Olivo threatened to kill the victim, initiated the fight, and stabbed him multiple times. We also conclude the evidence was sufficient to rebut the defenses of imperfect self-defense and heat of passion because it showed Olivo was the initial aggressor and the victim's conduct would not lead a reasonable person to act rashly or without due deliberation. Olivo also argues the trial judge used the wrong standard in evaluating his motion for new trial. We conclude the trial judge properly undertook and independent evaluation of the evidence and affirmed the verdict on that basis.

Finally, Olivo argues the abstract of judgment should be amended to reflect a stayed sentence on the conviction for dissuading a witness. We conclude the abstract of judgment properly indicates the court imposed the sentence but stayed execution.

We therefore affirm the judgment in all respects.

# I

## FACTS

In February 2018, W.J. was a United States Marine stationed at Twentynine Palms in California. He lived off base in a nearby apartment complex.

Dominique C. had served under W.J.'s command for three months. The two became friends and Dominique regularly visited W.J. at his apartment.

W.J. knew Olivo from the time they were stationed together in North Carolina in 2010 or 2011. They had lost touch but had recently reconnected. Olivo was living in Utah, and W.J. invited him to visit and stay with him. Olivo arrived in January 2018 and slept on the couch in W.J.'s living room.

At some point in January 2018, W.J. had to stay at the base for a period and asked Dominique to stay at his apartment and take care of his dogs. Dominique's girlfriend, B.K., was visiting and stayed with him. W.J. came to know that Olivo and Dominique did not get along well, and Dominique told him that there was "bad blood" between them. Olivo expressed the same sentiment to B.K. Olivo never told B.K. what he didn't like about Dominique, but he said she should break up with Dominique and find a better man like himself. B.K. rebuffed Olivo.

3

On February 4, 2018, Dominique hosted a Super Bowl party at W.J.'s apartment. Olivo and B.K. attended, along with a few other Marines from Dominique's unit. During the party, Olivo made strange comments to the other partygoers. He told them they should "go out and kill cops" and said he would cover for them. He also said he wanted to "kill somebody." At the party, no one took him seriously.

The morning after the party, Dominique woke early and left for physical training on base. B.K. remained asleep in an upstairs bedroom and came down late in the morning, where she found Olivo drinking in the living room. While cleaning up the kitchen, she saw Olivo's marijuana on the counter and asked him to remove it, and Olivo complied. She then saw a bag of candy on the kitchen counter and threw it away. Olivo became angry and yelled at B.K., saying he had planned to eat the candy. B.K. apologized, took the bag of candy out of the trash, and put it back on the counter. Olivo rinsed off the candy and told B.K. she should not have a "feisty attitude with him" because he was not her boyfriend, and he "wasn't afraid to beat [her] up." He moved closer to her and was agitated as he continued yelling at her. His conduct made her afraid, so she put her trash bag down and went upstairs.

As B.K. walked upstairs, Olivo warned her not to "do anything stupid" or call police. When B.K. got upstairs, she went into the bathroom and locked both the bedroom and bathroom doors behind her. She called Dominique and told him what had happened, said she didn't feel safe, and asked Dominique to come get her.

4

Dominique was on base and he asked his roommate, J.T., to drive him to the apartment. He said his girlfriend had been threatened and he wanted to go make sure she was okay. Dominique told J.T. he didn't like dealing with Olivo because he was "sketchy." He said he didn't want anything "to go down" and warned they should be careful. J.T. said Dominique was calm but also visibly upset about the situation and wanted to make sure B.K. was safe. Dominique told J.T. that if anything violent happened, he should take B.K. and keep her safe, and he agreed to try to keep things peaceful.

When Dominique and J.T. arrived, Dominique called B.K. and she came downstairs and met them in the kitchen. Dominique asked B.K. if she was okay and then walked over to Olivo who was sitting on the couch in the living room. Dominique asked Olivo what the problem was. He was calm but authoritative, stood with his hands open to the side. He wasn't holding a weapon and didn't make any physically aggressive moves.

Olivo responded that Dominique's girlfriend had taken an attitude with him. Olivo stood up from the couch, was "very aggressive and agitated," and he warned, "I'm not afraid. I'll kill everyone here." Olivo splashed the beer he was holding at Dominique's face and then threw the can at him. Dominique took a step towards Olivo and Olivo lunged at him and wrapped his arms around Dominique's waist. Olivo pushed Dominique up against a wall, and Dominique punched back at Olivo. They then stumbled towards the front door, still fighting. J.T. stayed with B.K. and moved her away to protect her, and as a result they could no longer see the fight.

J.T. and B.K. then heard Dominique yell, "he stabbed me." They ran over to the men and found them on the stairs near the front of the apartment. Olivo was on top of Dominique and facing him. J.T. grabbed Olivo, pulled him off Dominique, and pushed him into the living room, and saw that he had a knife. Olivo pointed the knife at J.T., so he put his hands up and backed away. Scared that Olivo would stab her or J.T. next, B.K. ran to the laundry room and called 911. At that point, Olivo opened the front door and walked out of the apartment, still holding the knife.

Dominique was bleeding profusely and sitting in a large pool of blood. B.K. and J.T. attempted to stop the bleeding by pressing towels against the wound.

Olivo was outside the apartment holding the knife and yelling, "I stabbed a Marine." Law enforcement arrived and found Olivo in the parking lot, holding a knife, with blood on his right hand and clothing. Olivo was rambling and speaking almost incoherently. They asked Olivo to drop the knife several times before he finally complied. He fought with officers as they tried to arrest him, but they eventually subdued him.

Olivo had a laceration on the web of his right hand between his thumb and forefinger, which is consistent with stabbing into something hard as well as with two people struggling over a knife. B.K. told police she and Dominique had a matching knife set and she believed that Dominique's knife was similar to the knife Olivo used in the attack.

6

An autopsy revealed Dominique suffered multiple stab and incision wounds. A police expert testified that a stab wound is deeper than it is long, and an incision wound is longer than it is deep. Dominique suffered an incision wound and a stab wound to his shoulder, a stab wound to his left hip, incision wounds in his back, and a stab wound to his right thigh. The wound to the right thigh injured his femoral artery and vein. The stab wound to the thigh was three inches deep and consistent with being stabbed with a three-inch pocket knife. That injury was life threatening and the others were not. The forensic pathologist listed Dominique's cause of death as "multiple sharp force injuries."

On December 20, 2019, a San Bernardino County jury found Olivo guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1, unlabeled statutory citations refer to this code), criminal threats (§ 422, subd. (a); count 2), and dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1); count 3). The jury also found Olivo personally used a knife while committing the murder. (§ 12022, subd. (b)(1).)

On November 6, 2020, the trial judge denied Olivo's motion under section 1181 to reduce the murder count to voluntary manslaughter. She then sentenced Olivo to 15 years to life in prison for the murder, added a one-year weapons enhancement to that count, sentenced Olivo to a consecutive 2-year term for criminal threats, and imposed but stayed a sentence for dissuading a witness.

Olivo filed a timely notice of appeal.

7

## II

## ANALYSIS

A. *Express and Implied Malice*

Olivo argues there was insufficient evidence of express or implied malice to support the conviction of second degree murder and asks us to reduce his conviction to involuntary manslaughter.

In considering a substantial evidence challenge of a jury verdict, we "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We "presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*Ibid.*) It's not enough to obtain reversal that "the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*) However, we note we must determine the sufficiency of the evidence after considering the whole record, including "the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the" People on appeal. (*People v. Johnson* (1980) 26 Cal.3rd 557, 577.)

In cases, like this one, where the record doesn't disclose which theory the jury relied on in convicting appellant on second degree murder, we must determine whether there was sufficient evidence under each theory separately. (*People v. Guillen* (2014) 227

Cal.App.4th 934, 982-983.) Here, the People presented the jury with evidence and argument of both express malice and implied malice.

Murder is the unlawful killing of another person with malice aforethought. (§ 187, subd. (a).) Second degree murder is the unlawful killing of a human being with malice, but without willfulness, premeditation, and deliberation, which are required to support a conviction of first degree murder. (§§ 187, subd. (a); 189; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) Malice may be express or implied. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

After careful review of the whole record, we have determined there was substantial evidence sufficient to support both theories of malice. We take express malice first. Malice is express "when there is manifested an intention unlawfully to kill a human being." (*People v. Saille* (1991) 54 Cal.3d 1103, 1115.) Express malice may be proven by direct evidence of an intent to kill or inferred "from the defendant's acts and the circumstances of the crime." (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

Olivo argues there was no evidence of express malice because he "did not threaten [Dominique] or otherwise indicate he wanted to kill him. There was no evidence that he trapped him, rendered him prone, or otherwise maneuvered him into a position of vulnerability." Moreover, he argues, nothing about his conduct before the confrontation indicated malice. Before the two men arrived, he "was acting smart and aggressive toward [B.K.], calling her feisty and telling her he could beat her up since he was not her

9

boyfriend. But none of this indicated appellant harbored any thought of ending [Dominque's] life."

Olivo's argument ignores much of the relevant evidence. To start, he ignores the evidence he initiated a physical confrontation with Dominique, throwing his beer at him and then tackling him. B.K. and J.T. testified Dominique was unarmed and not aggressive when he confronted Olivo about his treatment of B.K. But Olivo responded by splashing his beer at Dominique, saying "I'll kill everyone here," and lunging at Dominique and pushing him into a wall. Olivo's argument also ignores the evidence Olivo stabbed Dominique multiple times during the fight and inflicted a very deep wound to his thigh. The forensic pathologist testified Dominique suffered wounds on his shoulder, back, left hip, and right thigh. The wound to Dominique's thigh was three inches deep, indicating he stabbed the full length of the blade into Dominique. The jury could reasonably conclude based on the evidence that Olivo initiated the fight, did so without significant provocation, inflicted multiple knife wounds, including a deep stab wound to the thigh and that Olivo intentionally used the knife with the intent of killing his victim.

Olivo relies on *People v. Capps* (1984) 159 Cal.App.3d 546, 551 to argue there was insufficient evidence of express malice because he "did not threaten [Dominique] or otherwise indicate he wanted to kill him." But this argument ignores testimony that Olivo responded to Dominique's asking him if there was a problem by saying, "I'll kill everyone here." The jury could reasonably conclude this statement indicated Olivo, who proceeded to attack Dominique and fatally stab him, did have the intent to kill the victim.

10

Certainly, the totality of this evidence leaves us no choice but to conclude the jury could reasonably have reached that conclusion.

Implied malice has "both a physical and a mental component. The physical component is satisfied by the performance of an act, the natural consequences of which are dangerous to life." (*People v. Nieto Benitez, supra*, 4 Cal.4th at p. 106 [cleaned up].) The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." (*Id.* at p. 107.) "[T]he state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988.) There must be proof the defendant acted with conscious disregard of the *danger to human life*, not just conscious disregard of the risk of serious bodily injury. (*People v. Knoller* (2007) 41 Cal.4th 139,156.)

As regards the danger of the attack, the evidence that the stab wound to Dominique's thigh was three inches deep and fatally lacerated the femoral artery and vein and the evidence that he suffered multiple knife injuries to various parts of his body gave the jury a solid basis for concluding Olivo attacked the victim viciously and in a manner that was objectively dangerous to life. We conclude the evidence constituted substantial evidence that Olivo acted in a way in which danger to life, objectively speaking, was a natural consequence.

As regards Olivo's subjective mental state, the evidence gave the jury a basis for finding he acted with a conscious disregard for Dominique's life. A considerable amount

11

of evidence showed Olivo to be concerned with and unusually interested in killing. At the Super Bowl party the day before the attack, he said he wanted to "kill somebody" and tried to convince them that they should all go out and "kill cops" while he covered for them. Finally, and most importantly, right before the stabbing when Dominique approached Olivo, Olivo announced he would kill everyone. The jury could reasonably conclude from all this evidence that Olivo had made Dominique the object of his interest in killing and that he deliberately endangered Dominique's life by initiating a violent altercation with him and then stabbing him repeatedly.

B. *Imperfect Self-Defense and Provocation*

Olivo argues he was convicted of second degree murder under circumstances that arose to voluntary manslaughter at the worst. At the close of the prosecution's case in chief, he asked the trial court to reduce the murder charge to manslaughter. He argued the evidence could not establish murder as a matter of law because there was no evidence of who brought the knife to the fight and there was evidence of provocation. The trial judge concluded there was sufficient evidence of murder to go to the jury. Olivo made similar arguments after the jury found him guilty of second degree murder and in a motion for judgment notwithstanding the verdict under section 1181 before sentencing. The trial judge denied both motions, concluding the jury's verdict was adequately supported by the evidence.

On appeal, Olivo argues "the prosecution failed to prove [he] did not act in unreasonable self-defense or heat of passion. There was indisputably a fight in this case

12

that resulted in the stabbing death of [Dominique]. The evidence of the circumstances preceding the fight, including the discussion between [J.T.] and [Dominique] as to how [Dominique] would handle [B.K.] and himself in the event of violence, the evidence that the knife used in the stabbing belonged to the victim himself, and then the complete absence of evidence as to how the knife was introduced into the fray and what were the circumstances of the struggle and the stabbing, leave no reasonable conclusion other than the prosecutor failed to meet the burden of disproving the presumptive negation of malice."

Voluntary manslaughter is a lesser included offense of murder. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) A murder may be reduced to voluntary manslaughter when an accused acted in (1) unreasonable self-defense or (2) a heat of passion arising from sufficient provocation. (*People v. Moye* (2009) 47 Cal.4th 537, 549.)

Unreasonable self-defense obtains when the accused killed someone because he actually but unreasonably believed he was in imminent danger of death or great bodily injury. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.) If the issue of imperfect self-defense is properly presented, the prosecution must prove beyond a reasonable doubt that the accused did not actually believe he was in such imminent danger to establish malice. (*People v. Rios* (2000) 23 Cal.4th 450, 462.) However, an unreasonable belief will support a claim of imperfect self-defense only if the belief would support a claim of self-defense if it *were* reasonable. (*People v. Valencia* (2008) 43 Cal.4th 268, 288.) An accused may not invoke imperfect self-defense if, "through his own wrongful conduct,

13

(e.g., the initiation of a physical attack or the commission of a felony), [he] has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.]" (*Ibid.*) "[T]his means that if [the] defendant had first assaulted [the victim], then unreasonably believed the victim was assaulting him, a claim of imperfect self-defense would be unavailable because a claim of perfect self-defense would have been unavailable had the belief been reasonable." (*Ibid.*)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. The defendant must actually, subjectively, kill under the heat of passion. But the circumstances giving rise to the heat of passion are also viewed objectively. . . . [T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, because no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." (*People v. Manriquez*, *supra*, 37 Cal.4th at p. 584 [cleaned up].) Thus, the defendant's sudden quarrel or heat of passion arising from provocation may negate malice if it would cause a reasonable person of average disposition to act rashly and without reflection. (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) At trial, the prosecution has the burden to prove beyond a reasonable doubt that the circumstances of adequate provocation or heat of passion are lacking. (*People v. Rios*, *supra*, 23 Cal.4th at pp. 461-462.)

There was sufficient evidence to support the jury's determination that Olivo did not act in imperfect self-defense or out of a heat of passion arising from provocation. As discussed above, imperfect self-defense cannot be claimed by a defendant who, through his own wrongful conduct—for example initiating a physical assault—has created circumstances under which the victim's use of force is legally justified. Here, eyewitness testimony indicated Olivo initiated the physical assault when he threw his beer on Dominique, threatened to kill him, and then tackled him. The jury could reasonably have concluded from that evidence that Olivo created circumstances to justify Dominique's physical response. (*People v. Valencia*, *supra*, 43 Cal.4th at p. 288.) In addition, there was no evidence Olivo in fact believed he was in imminent danger of death or great bodily injury.

The same evidence that Olivo initiated the attack constitutes substantial evidence disproving heat of passion arising from provocation. B.K. and J.T. testified Dominique asked Olivo if there was a problem. Even if Dominique had asked the question in a taunting manner, that's not enough provocation to justify a violent response. (See *People v. Manriquez*, *supra*, 37 Cal.4th at p. 586 [reasonable person would not be provoked to killing by taunts that defendant was "a 'mother fucker'"]; (*People v. Najera* (2006) 138 Cal.App.4th 212, 226 [""""A provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter""""].) In addition, there was no

evidence proving Olivo's reason was clouded by strong passion resulting in Dominique's supposed provocation. On this evidence, the jury reasonably could conclude there was no provocation "sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." (*People v. Breverman* (1998) 19 Cal.4th 142, 163 [cleaned up].)

We therefore conclude substantial evidence supported the jury's second degree murder verdict.

C. *New Trial Motion*

Olivo argues the trial judge erred in denying his motion for new trial because she refused to independently evaluate the evidence. He argues we should reverse his conviction and remand to, at minimum, allow the trial judge to consider his motion for a new trial under the correct standard.

"In reviewing a motion for a new trial, the trial court must weigh the evidence independently. It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. The trial court should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict. A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. The determination of a motion for a new trial rests so completely within the court's discretion that its action

16

will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*People v. Fuiava* (2012) 53 Cal.4th 622, 729-730 [cleaned up].)

We conclude the trial judge did not abuse her discretion by applying the wrong standard. After the jury found Olivo guilty of second degree murder, counsel made an oral motion for a judgment notwithstanding the verdict, asking the judge to enter a judgment of manslaughter. The judge commented this wasn't "the typical kind of second degree that we end up with under the totality of the circumstances," but said she wouldn't "undercut a jury or second guess a jury" if the conviction was supported by the evidence. The judge then denied the motion. "In this case based upon the circumstances and the testimony that was elicited the Court does believe that the jury could have found that lawfully and reasonably and while it may not be the Court's decision it wasn't a court trial. [¶] So, I'm not going to overturn the jury's verdict."

Before sentencing, Olivo filed a renewed motion for judgment notwithstanding the verdict under section 1181, subdivisions (5) and (6). He asked the trial judge to undertake an independent review of the evidence and either reduce the conviction to manslaughter or order a new trial. The trial judge again denied the motion. "Based on the totality of the circumstances, the court does believe that the denial that I've made previously does encompass a verdict notwithstanding. The court does recognize the defense motion, does recognize that the court under certain circumstances does have the authority and the ability to sentence notwithstanding a verdict. [¶] In this case, however, what defense is asking the court to do is based upon its own experience and judgment circumvent that of

17

the jury." The judge continued by commenting she "was not selected as a juror . . . [and] would not have probably served as a juror in this case. And therefore the fact that this court based on its own experience might have viewed the facts differently and this court does not warrant a verdict notwithstanding." She also commented she "is allowed to use some of that experience and understanding in sentencing which I do believe is appropriate because I am the judge on the case. But I do not believe it is appropriate at this point for the court to substitute its decision-making process for the jury's. This jury did spend a lot of time deliberating. They considered many different facets in the court's opinion, and the court is not going to overturn any of their findings in this case. So that motion is denied."

While some of these comments suggest the judge was deferring to the jury, there is some deference built into the correct standard. The judge is "guided by a presumption in favor of the correctness of the verdict" but evaluates the evidence by "consider[ing] the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict." (*People v. Fuiava*, *supra*, 53 Cal. 4th at pp. 729-730.) Here, the trial judge recognized she had the authority to depart from the jury, but instead chose to leave the verdict in place because the jury's verdict was supported after the court's evaluation of the evidence. "Although it would have been preferable for the court to have been more specific, stating it was denying the motion based on its independent weighing of the evidence, its failure to do so and its use

18

of less than artful language cannot be equated with having applied the wrong standard." (*People v. Price* (1992) 4 Cal.App.4th 1272, 1276.)

*People v. Robarge* (1953) 41 Cal.2d 628 and *People v. Watts* (2018) 22 Cal.App.5th 102 are distinguishable. In *Robarge*, the Court of Appeal concluded the trial judge had not evaluated the evidence independently because the judge commented he affirmatively disbelieved the key witness but believed he was bound to follow the jury anyway. (*Robarge*, at p. 634.) In *Watts*, the Court of Appeal reversed the trial judge because "the court repeatedly informed Watts it could not reweigh the evidence and that its only concern was whether the prosecution had presented sufficient evidence to present the matter to the jury." (*Watts*, at p. 113.) This case is more like *People v. Davis* (1995) 10 Cal.4th 463, where the trial judge made comments that could be read to suggest undue deference to the jury's findings, the record as a whole shows the judge did not regard herself as bound by the jury's findings. (*Id.* at p. 523.)

We therefore reject the challenge to the judge's ruling on the new trial motion.

D. *Stay of the Three-Year Sentence*

The abstract of judgment reflects that the trial judge imposed a concurrent sentence on the dissuading a witness count and stayed execution of the sentence under section 654. Olivo argues this was error and that the concurrent term should not be reflected on the abstract of judgment since the court stayed the sentence. That's incorrect. Section 654 precludes punishing an act or omission under one or more penal provisions, but to comply the trial judge must nevertheless "impose sentence but . . . stay the

19

*execution* of the duplicative sentence[.]" (*People v. Duff* (2010) 50 Cal.4th 787, 796.) The abstract of judgment in this case correctly reflects the court imposed a sentence for dissuading a witness and stayed execution of the sentence under section 654. There's no need to correct the abstract of judgment.

## III

## DISPOSITION

We affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

20